THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD HINES *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 79-779

Opinion filed June 24, 1980.

Ralph Ruebner and Susan Bandes, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Mark A. Graf, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Defendants Hines and Gray were charged with the armed robbery, battery, and aggravated battery of Mrs. Betty Canalini which occurred on July 13, 1974, as she was walking down the street with her 10-year-old son, Kenny. The victim identified defendants at a pretrial photo display, at a showup and in court. Defendants' motion to suppress these identifications was denied. They were convicted of armed robbery in a bench trial and each received 5- to 10-year sentences. Defendants contend on appeal that the pretrial photo identification testimony should have been excluded because the victim had only a brief glimpse of her assailants and viewed the photographs while still adversely affected by the trauma; the showup identification should have been excluded because it was suggestive and unnecessary; the in-court identification should have been excluded

because it was a direct result of the two improper pretrial identifications; and defendants were not proved guilty beyond a reasonable doubt. For the following reasons, we affirm.

At trial, Curtis Blanc, a Chicago police officer called by the State, testified that on July 13, 1974, about 11:30 a.m., he responded to a call concerning an armed robbery. After speaking with two officers already there, he went to the 18th District tactical office, selected 10 photographs and proceeded to Henrotin Hospital where he interviewed the victim and showed her the 10 photographs (introduced into evidence as People's Group Exhibit No. 1). She made a positive identification of defendant Hines and a tentative identification of defendant Gray. At the time the victim selected the photos, her eyes were tearing and "beginning to swell and turn black and blue underneath." Although emotional and hysterical, she was nonetheless very lucid. The next day, he arrested both defendants and placed them in separate lineups which were viewed by Kenny, who made no identification.

The next evening, Blanc and several other policemen brought the two defendants to the victim's hospital room. As they entered the room, the victim began to cry and nodded her head affirmatively. After defendants were taken out of the room, Blanc asked her if she was sure that these were her assailants and she responded that she was. She then requested that each defendant be brought back into the room alone. After viewing each separately, she again stated she was certain that these were her attackers. Blanc had not requested the victim to come to a lineup because her doctor advised him that she was in "guarded condition" and could not leave the hospital.

On cross-examination, Blanc testified that although he knew where both defendants lived, he did not go to their homes after the photo identification on July 13. When the victim made the photo identification, her nose was bleeding and she was holding a cloth to it. The victim was never subsequently requested to view a lineup.

Betty Canalini testified that on July 13, 1974, at about 11 a.m., as she was walking down the street with her son, she saw two boys cross the street and walk up towards her; one hit her with a gun and the other grabbed her purse. She identified defendants in court as these two boys. After being hit she looked directly at their faces as she fell backwards. Defendant Hines hit her a second time with the gun, tore off her blouse and bra, kicked her in the chest, and struck Kenny with the gun. He asked if she had any more money, pointed the gun at her and pulled the trigger, but it didn't fire. Both defendants then walked away carrying the purse which contained $190. Kenny ran and called the police who arrived shortly thereafter and took her and Kenny to the hospital. While in the X-ray room, a policeman interviewed her and showed her about 10 photos.

She selected two photographs as those of her attackers. She related that she had some trouble with her eyes because of a broken blood vessel in one eye. On the morning of July 14, 1974, after having been transferred to Mt. Sinai Hospital, Officer Perez telephoned her and said that "* * * he had a few guys that they wanted to bring down * * *." Around 3 p.m. that day, several police officers came into her room and said they brought some boys with them but for her not to say anything until she was sure who they were. When the two boys were brought in she told the police that "the minute they entered my room there was not a doubt in my mind * * * they were the boys" and that she could "never forget their faces."

On cross-examination, she stated that when she first saw defendants, she paid no particular attention to them. The prescription glasses she was wearing were knocked off her the second time she was hit by defendants. The total incident lasted about five minutes. When the police first arrived at the scene, she described the attackers as two black boys, one a little shorter than her and the other a little taller. When Officer Blanc came to the hospital later that day with the photos, her nose was bleeding but she was not dizzy. She took no medicine until after Blanc's interview. Although she was tense and nervous when she viewed the pictures, she "couldn't forget those faces." When the policeman called on July 14, he didn't say who he was bringing in, only that he was bringing some boys for her to see. When she viewed them that day, she was experiencing headaches and dizziness.

Dr. David Rorem, an expert medical witness, in response to a hypothetical question, testified for the defense that based on the drugs the victim received on July 14 as shown by her hospital records, her consciousness and ability to perceive may have been affected. The hospital record also indicated to him that the victim experienced projectile vomiting between the hours of 3 and 7 p.m. on July 14, which may imply some sort of effect on consciousness. On cross-examination, he could not say with certainty that projectile vomiting is always compatible with neurological damage, but there may have been some impairment that day. On redirect examination, he could not say that she would have had trouble correctly identifying someone or not.

Robert Buckhout, a witness-perception expert, in response to a hypothetical question, testified for the defense, first, that when a victim is attacked with a gun, she tends to focus on the gun, not on the face of the attacker. Second, two identifications from the same set of photographs lead to greater unreliability. Third, when a second identification test is conducted, the witness may remember the identification made in the first test rather than the person who committed the crime. He questioned the reliability of the identifications made upon the 10 photographs.

Defendant Hines testified at the motion to suppress, although not at

trial, that he was taken to the hospital room by eight or ten plainclothesmen; when the police awoke the victim, her voice was slurred. Defendant Gray did not testify at the trial or at the hearing.

■■ Defendants first assert that the photo identification testimony should have been excluded because the victim made the identifications after only a "brief glimpse" of her assailants, and at a time when she was experiencing physical and emotional trauma, citing *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967. Although they seek exclusion of the evidence, their argument addresses only its weight, not its admissibility. Defendants' factual characterizations are inaccurate: the record shows that the victim observed her assailants throughout a five-minute period and therefore had more than a "brief glimpse" of her attackers. Although she was emotional at the time of the photo display, nothing indicates an inability to observe or remember as would justify exclusion of her testimony. *Simmons* sustains the identification procedure in this case.

■■ Defendants next claim that the showup was suggestive because defendants were the only blacks in the room and the victim was told beforehand that the police were bringing some people for her to see. Further, they assert that the showup was unnecessary in the absence of evidence that she would not survive, citing *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967. They conclude that the showup identification therefore should have been excluded. The State concedes that showups are inherently suggestive but argues their use is proper under exigent circumstances, also citing *Stovall.* In any event, the State maintains, the showup identification was reliable under the totality of the circumstances. Assuming, *arguendo*, that the showup was unnecessarily suggestive, the identification nevertheless was sufficiently reliable and therefore admissible under the standards set forth in *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253, and *Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 381-82. These cases hold that, in evaluating the admissibility of out-of-court identifications made pursuant to unnecessarily suggestive confrontations, the following factors are to be considered: the opportunity of the witness to view the assailant at the time of the crime, the witness' degree of attention at that time, the accuracy of the witness' prior description, the level of certainty demonstrated by the witness at the confrontation, and the interval of time between the crime and the confrontation. (See also *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 903, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) At bar, these factors weigh heavily in the State's favor: the victim attentively viewed the faces of her assailants at close range for about a

five-minute period; she expressed a high level of certainty in her identifications; and the confrontation occurred the day after the crime. The initial description, while not strong, does not affect the reliability of the evidence in light of the other factors. (*Neil v. Biggers* (1972), 409 U.S. 188, 200-01, 34 L. Ed. 2d 401, 411-12, 93 S. Ct. 375, 382.) We find from these facts no substantial likelihood of irreparable misidentification.

The in-court identification of defendants was also admissible because it followed in the wake of the two proper pretrial identifications. *Manson v. Brathwaite* (1977), 432 U.S. 98, 110 n.10, 53 L. Ed. 2d 140, 151 n.10, 97 S. Ct. 2243, 2251 n.10; *People v. Manion* (1977), 67 Ill. 2d 564, 572.

Defendants' reasonable doubt argument based upon allegedly unreliable identification is also not persuasive. The victim had sufficient opportunity to view her assailants in broad daylight and the convictions based thereon were proper. See *People v. Clarke* (1971), 50 Ill. 2d 104, 110, 277 N.E.2d 866.

Affirmed.

PERLIN, P. J., and DOWNING, J., concur.