THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY GRAHAM, Defendant-Appellant.

Second District   No. 2—87—0369

Opinion filed March 3, 1989.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and Richard D. Frazier, both of State Appellate Defender's Office, of Springfield, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Henry Graham, was convicted of robbery and theft from a person following a jury trial in the circuit court of Lake County. Defendant was sentenced to seven years' imprisonment on the robbery conviction. On appeal, defendant argues the following: (1) the State failed to prove him guilty of robbery beyond a reasonable doubt; (2) defendant was denied a fair trial by an impartial jury where evidence of defendant's prior criminal history was intentionally elicited by the prosecutor; (3) defendant was denied his right to the effective assistance of counsel; (4) defendant was denied his right to due process by the exclusion of expert testimony as to the unreliability of eyewitness identification; and (5) the trial court erred in sentencing defendant to the maximum penalty.

Defendant's first argument on appeal is that the State failed to prove his guilt beyond a reasonable doubt in that the only evidence against him was the complaining witness' identification testimony. Defendant's argument is based on what we perceive as two separate issues. The first is whether the identification procedures used by the police were so impermissibly suggestive as to make unreliable and, hence, inadmissible the complaining witness', Ms. Conzelman's, pretrial and in-court identifications of defendant. The second issue raised by defendant's first argument is, if Ms. Conzelman's identifications of defendant are sufficiently reliable to be admitted before the jury for its consideration, are these identifications, *alone*, sufficient to convict defendant beyond a reasonable doubt.

At approximately 5:30 p.m. on January 6, 1987, in Waukegan, Illinois, Leslie Conzelman was robbed in a parking lot. Ms. Conzelman testified at trial that she had just left work and had walked the couple

blocks to the lot where she had parked her car. It was dark out. Her car was parked in a lot that had five to six overhead yellow lights. Each light illuminated an area of approximately six to eight cars. Her car was parked in the middle of the lot beneath one of these yellow lights. She carried in her left hand a briefcase inside of which was her purse. As she entered the parking lot, she noticed a black man wearing a navy knit cap with "scruffy" facial hair around the mustache area. She testified that she looked at this person very briefly. As she walked to the middle of the lot, she approached the left side of her car. She did not notice anyone else in the lot. She carried her briefcase in her left hand and her car keys in her right. As soon as she opened her car door, someone jumped on her back, grabbing her from behind. The attacker struck her in the face with an open hand while pushing her up against her car. The attacker was trying to pull Ms. Conzelman's briefcase from her. Ms. Conzelman was still being pushed against the car and could not see her attacker. Ms. Conzelman then decided to let go of her briefcase and told the attacker "just take it." At this point, she released the briefcase and turned and faced her attacker for the first time. She saw the same person she had briefly looked at when she entered the parking lot area. He was standing about one foot away, and they were face to face. Ms. Conzelman testified that he was a little taller than herself and looked scared. The attacker looked at her a few seconds and then backed away slowly to the south approximately 20 to 30 feet, the first 10 feet of which his face was illuminated by one of the parking lot lights. He then turned and continued walking south toward the back of a hot dog stand called Jordy's. Approximately 75 feet away, the attacker again turned and stared at Ms. Conzelman for a "few minutes." Ms. Conzelman testified that a spotlight in the back of Jordy's allowed her to again see the attacker's face. The attacker then turned and ran away. Ms. Conzelman further testified that she had seen her attacker at least two to three times before in the area at a nearby bus stop, the most recent time being December 1986. Ms. Conzelman returned to her office and called the police.

Approximately 10 minutes later, Officer Kevin Runyard arrived at Ms. Conzelman's place of employment. They talked briefly, and then Officer Runyard drove Ms. Conzelman around the area to see if she could point out her attacker. After a short drive, they proceeded to the police station where Ms. Conzelman went through approximately 300 mug shots of black males in a 45-minute period. During this time, she was seated at the same table as Officer Runyard but separated by a partition. Officer Runyard wrote his report while she viewed photos.

Ms. Conzelman, after viewing all the photos, picked out two photos. The first photo was of defendant, Henry Graham. The second photo was of a man named Freeman Geater. Ms. Conzelman indicated that the first photo she picked closely resembled her attacker and that the first photo was closer to her attacker than the second photo. At this point, the police brought her two more photos. Those photos were of the same two people, defendant and Freeman Geater, and were apparently taken at the same time as the previous two photos Ms. Conzelman had picked out but from different angles. Ms. Conzelman again indicated that the photo of defendant was closer to her attacker than that of Freeman Geater. While at the station, Ms. Conzelman told Officer Runyard, as best she could, everything she remembered. She testified that she gave a description of the attack itself and of her attacker to Officer Runyard after having viewed the mug shots and selecting two mug shots as resembling her attacker. She testified that she told Officer Runyard all about the attack just as she described in her trial testimony. Further, she testified that she told Officer Runyard that her attacker was a black male, 5 feet 10 inches to 5 feet 11 inches. He wore a mid-length brown jacket, knit hat and pants and was in his early to midtwenties. She testified that she told Officer Runyard that the attacker had "scruffy" facial hair in the area of the mustache and beard. She denied telling Officer Runyard that her attacker had a large "afro." Ms. Conzelman then went home.

On January 8, 1987, Ms. Conzelman was asked to come to the police station to identify and retrieve her briefcase and purse, which had been found. Money and several credit cards were missing from her purse. After picking up her purse, Ms. Conzelman met with Lieutenant Stevenson for approximately 20 minutes. Lieutenant Stevenson showed Ms. Conzelman the same two mug shots she had originally picked out two days earlier. According to Ms. Conzelman's trial testimony, she thought she identified Henry Graham's photo as that of her attacker at that time. However, on cross-examination, she said she was not certain that she identified defendant's mug shot as that of her attacker on January 8, 1987. She also stated on cross-examination that she told Lieutenant Stevenson that she had seen her attacker several times at a bus stop in the downtown area on prior occasions, most recently in December 1986. She also testified that she described the attack and attacker to Lieutenant Stevenson but denied saying the attacker had "dread locks." She stated she told Lieutenant Stevenson her attacker possibly had long curly hair because it was sticking out the front of the attacker's cap.

On January 13, 1987, Ms. Conzelman was at work when Officer

Marquez came by to see her. Ms. Conzelman testified that he had two photos she had never seen before. These photos were of the same two people whose mug shots she had previously picked out the night of the robbery. She testified that she told Officer Marquez that one of the photos, defendant's, was of the robber, and the other photo, that of Freeman Geater, clearly was not. The two photos were more recent pictures of defendant and Freeman Geater. At this point, Officer Marquez had Ms. Conzelman accompany him in his car on a 15-minute drive to observe black males, none of whom she recognized. They then pulled up to the Waukegan Township office and observed six people in front of the building. Four of the people were black, and Ms. Conzelman did not recognize any of them. Officer Marquez then exited the car and went inside the township office and came out with defendant, whom he placed against the wall of the building. Ms. Conzelman testified that Officer Marquez came back to the car and asked Ms. Conzelman if this was her attacker, and she said, "Yes." Officer Marquez called in other officers to arrest defendant.

Officer Runyard was the next witness for the State. He testified to receiving a report of a robbery over the radio. The description he received over the radio was a black male, 5 feet 10 inches to 5 feet 11 inches, with a blue knit hat, brown jacket, blue jeans and full "afro" hair. Officer Runyard responded to Ms. Conzelman's work address, where he talked with her for 15 to 20 minutes, and then proceeded to drive the area with Ms. Conzelman before taking her to the police station. Officer Runyard testified that Ms. Conzelman's description of the attack was brief. He testified that she described a brief struggle and that the attacker ran off to the south with her briefcase. He also recalled her saying she saw the attacker face to face. However, Officer Runyard's report did not contain reference to the attacker backing up, any mention of Jordy's or any face-to-face confrontation. Further, Runyard's report did not contain any reference to a description of facial hair, nor did he recall Ms. Conzelman ever saying the attacker had facial hair. However, Officer Runyard did recall Ms. Conzelman saying the attacker had a full "afro."

Lieutenant Stevenson testified next for the State. He testified that on January 8, 1987, he showed Ms. Conzelman the two photos she originally picked out of the mug books, and she stated again that defendant's "is closer to the offender than any other." He also testified that he discussed the attack and attacker with Ms. Conzelman and that she never mentioned that the attacker walked toward Jordy's. Further, Lieutenant Stevenson testified that Ms. Conzelman told him the attacker had a mustache and "dread locks"; was 5 feet 9

inches to 5 feet 10 inches; and 150 pounds with a thin build.

Officer Marquez was the next and last witness for the State. He testified that on January 13, 1987, Lieutenant Stevenson told him to get updated photos of two "possible offenders," defendant and Freeman Geater, the two people Ms. Conzelman had identified as resembling her attacker. Officer Marquez testified that although his report did not indicate it, he attempted to look for Freeman Geater for 15 to 20 minutes on January 13, 1987, and was unable to find him. Officer Marquez then proceeded to defendant's residence. Defendant was not there, and Officer Marquez proceeded to the Waukegan Township office, where he found defendant. Officer Marquez informed defendant that he was doing a police investigation and asked defendant if he would accompany Officer Marquez to the station. Defendant voluntarily went to the police station, where Officer Marquez took a Polaroid snapshot of defendant and then returned defendant to the Waukegan Township office. Officer Marquez then proceeded directly to Ms. Conzelman's place of employment with the new photo of defendant and a more recent photo of Freeman Geater, which the police already possessed.

Although Officer Marquez' report fails to mention a second photo, Officer Marquez testified he showed Ms. Conzelman both defendant's and Freeman Geater's photos. Ms. Conzelman identified the photo of defendant as that of her attacker. Officer Marquez also testified that Ms. Conzelman stated to him that she had seen defendant numerous times in the downtown area before the attack. Officer Marquez testified that he then took Ms. Conzelman to see defendant in person "for the purpose of making sure that she knew who she was talking about." Officer Marquez drove Ms. Conzelman to a corner across from the Waukegan Township office. He told Ms. Conzelman that he took her to that area so that "she could view male blacks to see if she could identify the same individual she identified in the photos prior to going to that location." After having Ms. Conzelman view male blacks in the area for a few minutes, Officer Marquez testified that he got out of his car, went inside and, again, found defendant. He asked defendant to step outside with him but did not tell defendant why. Defendant stood by the door to the building. Officer Marquez then returned to the car, which was parked across the street, and asked Ms. Conzelman if she recognized defendant. She responded "yes," and Officer Marquez called in other police to arrest defendant. Officer Marquez further testified that defendant consented to a search of his residence and that no evidence of Ms. Conzelman's property or the clothes she described the attacker as wearing were found at defend-

ant's place of residence.

After the State rested, defendant moved for a directed verdict, arguing that the State's evidence was insufficient to convict, especially where Ms. Conzelman's pretrial identification was gained by impermissibly suggestive procedures which made her in-court identification unreliable. The trial court denied defendant's motion. Defendant proceeded to call three alibi witnesses. These witnesses were friends and relatives who testified in substance that defendant baby-sat all day on January 6, 1987, and that they had seen defendant at or near the time that Ms. Conzelman was attacked. These alibi witnesses also testified that defendant did not own or wear clothes described by Ms. Conzelman as having been worn by the attacker.

The only evidence presented by the State to prove defendant was the robber was the testimony concerning the pretrial identification by Ms. Conzelman and the testimony of police concerning that identification, along with Ms. Conzelman's in-court identification of defendant as the robber. No other evidence connecting defendant to the crime was presented to the jury. The jury found defendant guilty.

■ First, we address defendant's arguments concerning the allegedly suggestive identification procedures employed by the police. Initially, defendant asserts that Ms. Conzelman's initial selection of defendant's and Freeman Geater's mug shots was somehow mistaken. Defendant does not argue and the record does not indicate that the police or the photographs used in any way influenced the witness' selection of defendant's mug shot. Defendant's argument that Ms. Conzelman's initial selection of defendant's mug shot was mistaken goes to the weight not the admissibility of testimony concerning her selection of defendant's mug shot as closely resembling her attacker. (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355; *People v. Hines* (1980), 85 Ill. App. 3d 1047, 407 N.E.2d 853.) Having Ms. Conzelman view over 300 mug shots of black males for 45 minutes, after which, without any prompting, she picked out two mug shots as closely resembling her attacker was not improper police procedure absent any allegation that the procedure was somehow suggestive. See *People v. Kavanaugh* (1980), 85 Ill. App. 3d 783, 408 N.E.2d 23 (it is proper to use photographic lineups at initial investigatory stage); *People v. Wheeler* (1979), 71 Ill. App. 3d 91, 388 N.E.2d 1284.

■ ■ However, the actions of Officer Marquez on January 13, 1987, in which he showed defendant's updated photo to Ms. Conzelman and then did a one-man showup of defendant were unnecessarily suggestive. The practice of showing suspects singly to persons for purposes of identification and not as part of a lineup has been widely

condemned. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) Further, where a suspect is in custody or otherwise available for a fair lineup, there is no need to resort to photo arrays. (*People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634; *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247 (photo arrays should not be used unless justified by extenuating circumstances).) In the instant case, it appears a lineup was quite feasible as of January 13, 1987, after defendant had been identified as a possible offender. The police went as far as picking up defendant and taking his photo and then returning him to the township office. Why the police did not conduct a corporeal lineup at that time is not explained by the record. Further, Officer Marquez did not even do a photo lineup but showed Ms. Conzelman only two photos, defendant's and Freeman Geater's. While the updated photo of defendant was subsequently lost and therefore not admitted at trial, the updated photo of Freeman Geater shows a black male with a receding hairline that would not have stuck out the front of the attacker's hat as described by Ms. Conzelman. The procedure employed in the instant case was unnecessarily suggestive. (See *People v. Laurenson* (1971), 131 Ill. App. 2d 2, 268 N.E.2d 183.) Additionally, immediately after this identification and the witness' revelation that she has seen defendant in the downtown area on numerous occasions before, Officer Marquez proceeded to perform a one-person showup at the Waukegan Township office in order to make sure the witness "knows who she is talking about," according to his testimony. This one-person showup appeared to be done in order to reinforce the witness' prior identification, which the State argues was positive. (See *People v. Goodman* (1982), 109 Ill. App. 3d 203, 440 N.E.2d 345 (where witnesses identified defendant two weeks earlier from photo array, impermissibly suggestive to take witnesses to defendant's bond hearing in another matter in order to reinforce witnesses' prior identifications).) However, even unnecessarily suggestive identifications or proper identifications made subsequently may be admitted if reliable. *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.

●■ ■ Reliability has been held to be the linchpin in determining the admission of identification testimony. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed 2d 140, 154, 97 S. Ct. 2243, 2253.) The reliability and, hence, the admissibility of allegedly suggestive identifications must be judged by the totality of the circumstances to determine whether admission of such evidence meets the fairness standard of the due process clause of the fourteenth amendment. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S.

Ct. 2243.) The elements to be considered in determining reliability include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the time of the confrontation; (5) the length of time between the crime and the confrontation; and (6) any acquaintance with the criminal prior to the crime. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 501 N.E.2d 781.) Under the totality of the circumstances, we find Ms. Conzelman's identification of January 13, 1987, sufficiently reliable to be admissible under the due process clause of the fourteenth amendment.

█ Ms. Conzelman had an excellent opportunity to view her attacker at the time of the robbery. She viewed her attacker "face to face" from about one foot away directly beneath one of the parking lot lights and was able to view the attacker's face again as he left the parking lot.

As to Ms. Conzelman's degree of attention, it is apparent she had no forewarning of the attack and was only able to focus her attention on the attacker's face after she let go of her briefcase. However, Ms. Conzelman's degree of attention was acute enough to remember what the man she saw when she entered the lot was wearing and to realize that her attacker was the same person. See *People v. Neal* (1987), 155 Ill. App. 3d 340, 346, 508 N.E.2d 452, 456.

Regarding the accuracy of the prior description of defendant, a general description was received over the radio by Officer Runyard. This description could have only come from Ms. Conzelman when she phoned the police. The description was detailed as to clothing and general as to facial characteristics. However, there was nothing about defendant's facial characteristics that stood out other than his facial hair. The discrepancy as to when Ms. Conzelman first told the police her attacker had facial hair or whether she described her attacker's hair as being an "afro," in "dread locks," or long and curly is particularly a matter of credibility for the jury and does not alone require exclusion of Ms. Conzelman's identification testimony. *People v. Frisby* (1987), 160 Ill. App. 3d 19, 34, 512 N.E.2d 1337, 1346; *People v. Neal* (1987), 155 Ill. App. 3d 340, 346, 508 N.E.2d 452, 456.

Ms. Conzelman and Officer Marquez testified that Ms. Conzelman positively identified defendant from his updated photo as well as at the show up. Further, only seven days had elapsed since the robbery. While Ms. Conzelman failed to mention in her initial descriptions that she had seen defendant several times before the robbery in the down-

town area, she did mention this fact either on January 8 or January 13, 1987, and this fact alone does not require exclusion of her testimony. Under the totality of the circumstances, the identification testimony was sufficiently reliable, and the suggestive procedures employed on January 13, 1987, did not create a very substantial likelihood of irreparable misidentification. Accordingly, Ms. Conzelman's in-court identification was also admissible at trial. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Neal* (1987), 155 Ill. App. 3d 340, 508 N.E.2d 452 (in-court identification made in wake of admissible out-of-court identification is admissible).

● ■ ■ Having found Ms. Conzelman's out-of-court and in-court identifications admissible, we next address whether Ms. Conzelman's identification of defendant, alone, is sufficient to convict beyond a reasonable doubt. It is well established and often stated that identification of the accused by a single eyewitness is sufficient to sustain a conviction, provided the witness viewed the accused under circumstances permitting a positive identification. (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355.) Further, it is well established that alleged discrepancies or omissions in identification testimony go to the credibility and weight of the testimony, a function properly left to the jury. (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355.) However, it is equally well established that a conviction cannot be sustained beyond a reasonable doubt *solely* by an identification of the accused which is vague, doubtful or uncertain. (*People v. Ash* (1984), 102 Ill. 2d 485, 468 N.E.2d 1153.) In the instant case, Ms. Conzelman had an excellent opportunity to view her attacker and positively identified defendant seven days after the attack. Further, the testimony of defendant's three alibi witnesses, although uncontradicted by the State, was vague and inconsistent on many details and was of a type which a reasonable jury could have chosen to disregard. (See *People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866 (rejected argument that victim's identification testimony in face of uncontradicted alibi testimony created reasonable doubt of the defendant's guilt).) We find Ms. Conzelman's identification testimony sufficient to convict defendant beyond a reasonable doubt. See *People v. Clarke* (1972), 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Frisby* (1987), 160 Ill. App. 3d 19, 512 N.E.2d 1337; *People v. Neal* (1987), 155 Ill. App. 3d 340, 508 N.E.2d 452. But see *People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232; *People v. Byas* (1983), 117 Ill. App. 3d 979, 453 N.E.2d 1141; *People v. King* (1973), 10 Ill. App. 3d 652, 295 N.E.2d 258; *People v. Laurenson* (1971), 131 Ill. App. 2d 2, 268 N.E.2d 183; *People v. Martin* (1968), 95 Ill. App. 2d 457, 238 N.E.2d 205; *People v. Marshall* (1966),

74 Ill. App. 2d 483, 221 N.E.2d 133.

Defendant's next contention on appeal is that he was denied a fair trial by an impartial jury where evidence of his prior criminal activity was erroneously admitted before the jury. Specifically, defendant argues that: (1) the trial court erred in failing to grant defendant's motion *in limine* to delete the number "1364" from the border of defendant's mug shot; (2) the prosecutor prejudiced the jury when he elicited from the State's witness the fact that defendant's photo was contained in a "mug book" of "known criminals, [and] arrestees"; and (3) it was plain error, or ineffective assistance of counsel, for the prosecutor and defense counsel to repeatedly refer throughout the whole trial to defendant's photo as a "mug shot" and to the book in which it was contained as a "mug book," thereby alerting the jury to defendant's prior criminal record and/or arrests which were totally unrelated and irrelevant to defendant's trial on the robbery charge.

■ As to defendant's arguments concerning the identification number on the border of defendant's photo admitted at trial, the record clearly shows defendant was objecting to admission of other photos in which defendant and Freeman Geater had police department identification signs hanging from their necks. These photos were never admitted at trial. The photo of defendant admitted at trial was not a typical "mug shot" from which a jury would necessarily infer prior convictions or arrests. (See *People v. Wheeler* (1979), 71 Ill. App. 3d 91, 388 N.E.2d 1284 (involved admission of mug shots in which suspect was shown in frontal and profile view or on which police department legend or arrest date was indicated).) Defendant's photo admitted at trial showed defendant facing forward from the waist up and standing against a plain white brick wall. Any argument that the number "1364" stuck on the bottom border of this photo led the jury to infer defendant's prior convictions or arrests is vague and speculative and does not require reversal. *People v. Loggins* (1985), 134 Ill. App. 3d 684, 693-94, 480 N.E.2d 1293, 1300.

It is not disputed that the photo of defendant which Ms. Conzelman initially picked as resembling her attacker was probative and admissible on the issue of identification. (*People v. Wheeler* (1979), 71 Ill. App. 3d 91, 388 N.E.2d 1284.) Defendant argues that since the photo was probative on the issue of identification but did not carry with it the prejudical inference of prior criminal activity often found in other "mug shots," the repeated reference of both the prosecutor and defense counsel to "mug books" and "mug shots" along with Officer Runyard's testimony that defendant's photo was picked out of a "mug book" of "known criminals, [and] arrestees" was prejudicial

and denied him a fair trial where the evidence was closely balanced, and he was convicted solely on the basis of Ms. Conzelman's identification testimony. Defendant did not testify in his own defense.

●■ Evidence that tends to show an accused has committed crimes or acts of misconduct which are distinct or entirely unrelated to the ones for which he is being tried are generally both incompetent and prejudicial. (*People v. Eliason* (1983), 117 Ill. App. 3d 683, 453 N.E.2d 908; *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238 (erroneous admission of evidence of other crimes carries high risk of prejudice and ordinarily calls for reversal).) Where incompetent evidence of other offenses, unrelated to the current offense, is contained in otherwise competent evidence, such irrelevant material should be deleted unless to do so would seriously impair its evidentiary value. *People v. Oden* (1960), 20 Ill. 2d 470, 170 N.E.2d 582.

●■ In the instant case, the prosecutor had already elicited the fact that Ms. Conzelman viewed "photos [of male blacks] in books in the detective bureau." The prosecutor then asked Officer Runyard what these books are commonly called, and Officer Runyard responded "mug books." Defense counsel's objection to this answer was sustained. The prosecutor then asked what was contained in these books. Officer Runyard responded "current mug shots of known criminals, [and] arrestees." Defense counsel again objected. The trial court sustained the objection, struck the answer and stated "the jury is instructed to disregard it." Defense counsel approached the bench and moved for a mistrial, and the trial court denied the motion but warned the prosecutor, "Don't ever pull that again in my courtroom." The State argues that the prosecutor did not intentionally elicit Officer Runyard's improper testimony. Whether the prosecutor's elicitation of such testimony was accidental does not answer the question of whether such testimony was prejudicial to defendant's right to a fair trial in the instant case. The State also argues that any error was harmless because defense counsel also used the terms "mug shot" and "mug book" and failed to object at other times when the prosecutor used those terms. We note that the prosecutor has a duty to ensure a fair trial for defendant and a failure by defense counsel to object does not alleviate that duty. See *People v. Oden* (1960), 20 Ill. 2d 470, 170 N.E.2d 582.

●■ The issue is whether evidence of defendant's prior criminal activity, whether as a result of plain error, the ineffective assistance of counsel or deliberate acts of the prosecutor, was harmless error or prejudiced defendant's right to a fair trial. Where other properly admitted evidence is not so overwhelming that no fair-minded jury could

have voted for acquittal, improperly admitted evidence is reversible error. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) Further, the trial court's sustaining of an objection to improper testimony and a general instruction to disregard does not necessarily eradicate the effect of improper evidence upon the minds of a jury. (*People v. McCray* (1978), 60 Ill. App. 3d 487, 377 N.E.2d 46.) In the instant case, the trial of defendant could have been conducted without improper reference to prior criminal convictions or arrests. Defendant chose not to testify to avoid being impeached by his prior crimes. The mug shot introduced at trial was not the type which necessarily would lead to an inference of prior arrests or crimes. Although we have determined the evidence was sufficient to convict beyond a reasonable doubt, defendant is entitled to have his guilt or innocence determined by the jury without improper and prejudicial matters being erroneously interjected. (*People v. Popely* (1976), 36 Ill. App. 3d 828, 345 N.E.2d 125; see *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41.(where guilt or innocence depends entirely upon testimony of the accuser and defendant, no error should be permitted to intervene).) Here, the record fails to affirmatively show that the repeated and improper references to mug shots and mug books along with the improper testimony elicited from Officer Runyard by the prosecutor were not prejudicial to defendant's right to a fair trial, and, therefore, the judgment must be reversed and the cause remanded to the circuit court for a new trial. (*People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41.) In light of our disposition of this appeal, we need not address defendant's other arguments on appeal.

The judgment of the circuit court of Lake County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

UNVERZAGT, P.J., and INGLIS, J., concur.