Fourth Division
 February 20, 1997









No. 1-95-0221

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Plaintiff-Appellee, ) COOK COUNTY.
 )
 v. )
 )
COLUMBUS McGEE, ) HONORABLE
 ) THOMAS HETT,
 Defendant-Appellant. ) JUDGE PRESIDING.


 PRESIDING JUSTICE WOLFSON delivered the opinion of the
court:
 Columbus McGee (McGee) was tried before a jury on a charge
of first-degree murder for the shooting of Tyree West. He
admitted the shooting, but claimed he acted in self-defense. He
was found guilty and sentenced to 55 years imprisonment.
 The issues in this case concern the various ways McGee's
believability as a witness was attacked by the prosecution.
Four prior felony convictions were admitted against him, and the
prosecution's cross-examination of the defendant included
questions about his repeated commission of other crimes, his
association with "robbers and murderers," and his use of an alias
to stay out of jail. 
 We reverse the defendant's conviction and remand the case 
for a new trial. 
FACTS
 At trial, 24-year-old Carice West testified that two years
earlier, on August 26, 1992, he and his brother, Tyree West,
visited Tyree's girlfriend, Vivian Clifton. Clifton lived in an
apartment at the corner of Central Park Avenue and Thomas Street
in Chicago. After eating dinner and watching TV, Carice and his
brother left Clifton's apartment sometime around 6:30 p.m. to go
to a grocery store to get cigarettes. The grocery store was
located a few blocks away at Augusta and Ridgeway.
 When leaving the grocery store, Carice noticed a Chevy
Malibu car with four black men inside. The men pointed toward
Carice and Tyree. As Carice and Tyree walked east on Augusta,
going back to Clifton's apartment, they heard shots being fired
and turned to see a black man shooting at them. Carice and Tyree
ran into an alleyway, over to Monticello Street, then back to
Augusta, and then to Central Park Avenue. On Central Park
Avenue, as they approached Clifton's apartment, they saw a black
man, whom Carice later identified as Columbus McGee, standing on
the corner, wearing dark pants and a blue sweater. Tyree shouted
that the man had a gun. Carice and Tyree began to run and McGee
started shooting.
 As Carice and Tyree ran, Tyree said that he had been hit. 
Carice helped Tyree into a gangway and then ran back to Clifton's
apartment to call for help. The police and an ambulance
responded and Tyree was taken to Mt. Sinai Hospital, where he
later died from a single gunshot wound to the back.
 Carice further testified that three days later, on August
29, 1992, he picked McGee's picture from a group of photographs
and identified him as the man who shot Tyree. He did not know
McGee and had never seen him before the shooting. On October 7,
1992, Carice witnessed a line-up at the police station and again
identified McGee as the shooter.
 John Butler, a forensic investigator for the Chicago police,
testified that on August 26, 1992, in the course of his
investigation of the shooting, he recovered three .38 automatic
cartridge cases from the ground near 1058 North Central Park
Avenue and three .9 mm NNY Luger cartridge cases from the ground
at the northwest corner of the intersection at Augusta and
Ridgeway.
 Detective Joseph Walsh of the Chicago police department
testified that he had been assigned to investigate the shooting
of Tyree West and became aware that McGee was wanted for
questioning. He learned that McGee was on probation and had an
appointment scheduled. Walsh and his partner went to the
probation office to speak to McGee. McGee did not keep the
appointment.
 Later, on the evening of October 6, 1992, the police
received a tip concerning McGee's whereabouts. Based on the
information received, Walsh, along with several other officers,
went to an apartment at 1007 Monticello Avenue. When the
officers knocked, a woman opened the door to the apartment and
said that McGee was not home. She allowed the officers to enter
the apartment to look for McGee. Walsh's partner, Detective
Whalen, discovered McGee hiding behind some clothes in the
bedroom closet. He was arrested and taken to the police station.
 Detective Keane, who also was at the apartment, discovered a
gun "clip" containing a single live round or bullet. This was
discovered between the mattress and box spring in one of the
bedrooms inside the apartment.
 Detective Keane also testified that he spoke with McGee in
an interview room at the police station following his arrest. 
After advising McGee of his rights, McGee made several
statements. First, McGee stated that he had gone to a store at
Monticello and Augusta with his daughter, that two men followed
him from the store, and that he shot at these men out of fear for
his own life. Next, McGee admitted that he was not with his
daughter, but claimed that two men approached him on the street
and that he shot at them because he was in fear for his own life.
 In his third statement, which he said was "the truth," McGee
said that he had gone to the store at Monticello and Augusta with
his girlfriend. His girlfriend, he claimed, told him that two
men, who had been in the store earlier, wanted to rob him. McGee
left the store and got into a car with three other black men. 
They drove down Augusta and he pointed out two guys walking down
the street. At Augusta and Ridgeway, McGee and one of the other
men in the car named "Little June," jumped out of the car and
fired shots at the two guys. Little June used a Tech 9 semi-
automatic pistol and McGee used a .38 semi-automatic pistol. The
two men ran off. McGee and Little June got back into the car and
took off after the two fleeing men. At Monticello Avenue, McGee
jumped out of the car and ran toward Central Park Avenue. As
McGee stood on the southwest corner of Thomas Street and Central
Park Avenue, he saw the two men running toward him on Central
Park Avenue. When the men saw him they turned around and started
to run away. They were unarmed. McGee fired three shots at
them, then left the area.
 After obtaining McGee's statement, Detective Keane called 
an assistant State's Attorney (ASA). ASA Earl Grinbarg came to
the station and met with McGee. McGee told Grinbarg the same
story he had told to Detective Keane about how the shooting
occurred, the third version. McGee told ASA Grinbarg that he
would sign a written statement, but after Grinbarg wrote out
McGee's statement, McGee refused to sign it.
 McGee was the only witness to testify for the defense.
First, he admitted that he had prior convictions for robbery,
aggravated battery, manufacture and delivery of a controlled
substance, and possession of a controlled substance. Then McGee
told about an incident that occurred on July 23, 1991, when he
was shot in the face. He said that he had been in an alleyway
with a friend when two men came up to them and put a gun to his
head. He grabbed the gun and it discharged in his face. McGee
had to be treated in the hospital for more than two months and
remained permanently disfigured. A plate was inserted in his jaw
to replace a shattered jaw bone and his speech was affected
because his tongue was mutilated. This event, McGee claimed,
caused him to become so fearful that he started carrying a gun.
 After this preliminary testimony, McGee told his version of
what happened on August 26, 1992. He did not deny shooting Tyree
West, but claimed that he did so in self-defense.
 He said that he was in the grocery store at Monticello and
Augusta with his girlfriend. After a conversation with his
girlfriend, he gave her $2,000, bond money he had just gotten
back from Cook County, to hold for him. McGee then started to
walk to McDonald's to get some food.
 At the intersection of Thomas Street and Central Park
Avenue, McGee heard someone say, "Nigger, blow that shit." He
turned around and saw two men, later identified as the West
brothers. He claimed that Tyree pulled out a gun, slapped him,
and demanded his gold chain. He took off the chain and gave it
to Tyree. Then Tyree threatened him and told him to leave the
area.
 McGee turned as if to leave, but pulled out his own gun. He
turned back around and directed a woman, who had gotten in the
way, to move. McGee claimed that Tyree and Carice heard him tell
the woman to move and turned around. Tyree then pointed his gun
at McGee and McGee fired. McGee said that, after he fired one
shot, the brothers turned to run away. He fired two more shots
as they ran. McGee admitted that he disposed of the gun in the
sewer after the shooting.
 In accord with defendant's theory of defense, the jury was
given instructions on self-defense and second degree murder based
on imperfect self-defense. 
DECISION
 l. Admission of defendant's prior convictions.
 The most troubling issue in this case concerns the trial 
judge's denial of the defendant's motion to exclude three of his
four prior felony convictions. The State proposed to offer the
convictions to impeach the defendant's credibility should he take
the stand.
 The defendant had been convicted of aggravated battery,
possession of a controlled substance, manufacture and delivery of
a controlled substance, and robbery. The defendant does not
seriously challenge use of the robbery conviction, but contends
the other three convictions should not have been admitted to
impeach him. 
 For tactical reasons, McGee revealed his prior convictions
during his direct testimony. Given the trial judge's pre-trial
ruling, he was not required to wait for cross-examination. He
may and does argue that he was unfairly prejudiced by the trial
court's ruling. He contends the prior convictions had no bearing
on his testimonial credibility, but served only to inform the
jury he was a bad person.
 Any discussion of the admissibility of prior convictions for
impeachment purposes necessarily begins with People v.
Montgomery, 47 Ill. 2d 510, 268 N.E.2d 695 (1971). 
 In Montgomery our supreme court adopted the 1971 proposed
version of Federal Rule of Evidence 609:
 "(a) General Rule. For the purpose of attacking
 the credibility of a witness, evidence that he has
 been convicted of a crime, except on a plea of nolo
 contendere, is admissible but only if the crime, (1)
 was punishable by death or imprisonment in excess of
 one year under the law under which he was convicted,
 or (2) involved dishonesty or false statement regardless
 of the punishment, unless (3) in either case, the judge
 determines that the probative value of the evidence of
 the crime is substantially outweighed by the danger of
 unfair prejudice." 47 Ill. 2d at 516.
 Section (b) of the proposed rule established a permissible
age limit for the convictions. Age of the convictions is not an
issue in this case.
 The 1971 version of Rule 609 never went into effect.
Federal Rule 609, as enacted in 1975, differs in some ways from
the proposed rule, but our supreme court remains committed to the
1971 proposal. Any doubt about that was laid to rest in People
v. Yost, 78 Ill. 2d 292, 295, 399 N.E.2d 1283 (1980):
 "It was not the court's intention that the standards
 for impeachment announced in Montgomery would be changed
 from time to time to correspond to whatever changes might
 be subsequently proposed for Federal Rule 609."
 Montgomery adopted the balancing test, or weighing process,
envisioned by the proposed rule. The prior conviction would be
excluded where the probative value of the evidence is
substantially outweighed by the danger of unfair prejudice.
 The importance of the balancing test was underscored in
Montgomery when the court quoted the Advisory Committee's 
reference to the test as "the most significant feature of the
rule." Montgomery, 47 Ill. 2d at 517.
 Trial judges were told to consider such factors as: "the
nature of the crime, nearness or remoteness, the subsequent
career of the person, and whether the crime was similar to the
one charged." Montgomery, 47 Ill. 2d at 518.
 We have described the impact of Montgomery:
 "A balance had to be struck. A figurative scale
 was drawn. On one side of the scale a trial judge was
 to place the probative value of the prior conviction.
 That is, the judge must consider the relevance of the
 prior conviction to an evaluation of the defendant's
 credibility as a witness. On the other side of the scale,
 the trial judge was to place all the factors that could
 result in unfair prejudice to the testifying defendant." 
 People v. Elliot, 274 Ill. App. 3d 901, 906, 654 N.E.2d 636
 (1995).
 This case was tried before either of the People v. Williams
cases decided by the Supreme Court and discussed at length by the
parties.
 In People v. Eddie Williams, 161 Ill. 2d 1, 641 N.E.2d 296 
(1994), the court considered the impeachment of the defendant in
a murder case with evidence of a voluntary manslaughter
conviction. Finding error, although harmless, the court
criticized the "increasingly mechanical application" of the
"rationale that a felony of any type evinces a disrespect for
societal order and thus adversely affects the defendant's
veracity***" Williams, 161 Ill. 2d at 39. The court then said:
 "The Montgomery rule does not, however, allow
 for admission of evidence of any and all prior crimes.
 The focus of Montgomery was on crimes which bear upon
 the defendant's truthfulness as a witness." Williams,
 161 Ill. 2d at 39.
 Some appellate courts took the Eddie Williams decision to
mean a prior conviction should not be placed on the balancing
scale unless it has something to do with the defendant's
testimonial believability, rather than merely reflecting
disrespect for social order. See, for example, Elliot, 274 Ill.
App. 3d at 908-09.

 Social order offenses gained back their place on the scale
less than two years later in People v. Frank Williams, 173 Ill.
2d 48, 670 N.E.2d 638 (1996). There, the court said it did not
intend to exclude from the weighing process a felony conviction
that evinces disrespect for social order. 
 What matters, said the Frank Williams court, is that the
trial judge understand and use the Montgomery balancing
test--whether the probative value of the evidence of the prior
crime is substantially outweighed by the danger of unfair
prejudice. Further, it is not necessary that the trial judge
"explicitly state that he was balancing the opposing
interests***" Williams, 173 Ill. 2d at 83. It is enough that
"there is no reason to suppose that he disregarded the familiar,
well-established Montgomery standard in determining that the
impeachment was proper." Williams, 173 Ill. 2d at 83.
 The trial judge in this case understood he was dealing with
a Montgomery issue. He knew he had discretion to exclude the
convictions. He concluded the lack of similarity between the
murder charge being tried and the prior convictions obviated the
danger of the jury saying "well, he did that same crime before,
so he will do it again."
 But then the trial judge said:
 "It is my experience that in assessing the question
 of credibility a person's background, be it good, bad or
 indifferent, is something the jury should be allowed to
 consider."
 Our concern is that the required weighing process ended once
the trial judge determined the prior convictions were not similar
to the charge being tried. That is what he seemed to be saying.
If so, proper consideration was not given the Montgomery
balancing test.
 Given the Frank Williams decision, we conclude the trial 
court did not err when it placed the two drug convictions on the
scale, even though the rationale for use of that kind of crime
has been a defendant's "disposition to place the advancement of
individual self-interest ahead of principle or the interest of
society***" People v. Nelson, 31 Ill. App. 3d 934, 938, 335
N.E.2d 79 (1975). And while we have difficulty seeing the
evidentiary value of an aggravated battery conviction in this
case, we note that aggravated battery was the prior conviction
used for impeachment in the Frank Williams murder case.
 We believe, however, the trial court's remarks indicate it 
did not conduct a meaningful balancing test. Once the judge 
found dissimilarity of offense, the process stopped. No further 
weighing took place. "Good, bad, or indifferent background" is
not the key to admission. Because the trial judge failed to
weigh probative value against unfair prejudice, error was
committed. We do not express any view on which way the scale
should tilt. That is an area for the exercise of the judge's
discretion, subject, of course, to our review. All we say at
this time is that he must exercise that discretion.
 Standing alone, the failure to weigh might not result in
reversible error, but given the prosecution's excessive and
unfair attacks on the defendant's character, in a case where the
defendant's believability was in issue, we hold a new trial is
warranted.
 2. The prosecutor's questions and remarks.
 It is true, as the State observes, the questions and remarks
the defendant complains of were not specifically included in a
post-trial motion. Nor was contemporaneous objection made to
some of them. Ordinarily, we would find the issues waived.
People v. Coleman, 158 Ill. 2d 319, 633 N.E.2d 654 (1994).
However, these instances were part of a continuing attack on the
defendant's character which, when taken with the failure to
conduct a proper Montgomery balancing test, deprived the
defendant of a fair trial. See People v. Pitsonbarger, 142 Ill.
2d 353, 402, 568 N.E.2d 783 (1990).
 We summarize the instances of improper questions and
comments:
 (a) The prosecutor asked the defendant a series of questions
about criminal conduct unrelated to the issues at trial.
 The defendant testified on direct examination that after
someone shot him in the face in July, 1991, he began carrying
a gun to protect himself. The evidence was admitted to show 
defendant's state of mind when he shot Tyree West. On cross-
examination, the prosecutor asked:
 "Q. Now at that point you had already been
 convicted of the felony offense of robbery, aggravated
 battery, delivery of a controlled substance, is that
 correct?
 A. Yes.
 Q. Were you a convicted felon?
 A. Yes.
 Q. Correct?
 A. Yes.
 Q. And carrying a weapon for a convicted felon?
 [Defense counsel:] Objection, judge.
 [The court.] Overruled.
 Q. All right. The mere fact that you carry a weapon
 as a convicted felon is a felony offense itself. Now, you
 know that?
 A. Yes.
 Q. What was called felony unlawful use of weapon,
 correct?
 A. Yes.
 Q. Every day that you walk out that house with that
 gun you were committing a felony, is that correct?
 A. Yes.
 Q. How many of those days after you say you were
 shot in the face did you continue to carry a gun?
 A. I started carrying the gun in around springtime
 of 1992."
 The erroneous admission of other crimes evidence carries a
high risk of prejudice. People v. Lindgren, 79 Ill. 2d 129, 
402 N.E.2d 238 (1980). The danger is the evidence will
overpersuade the jury, causing it to convict the defendant
because of feelings he is a bad person deserving punishment
rather than on the basis of the facts related to the offense
being tried. People v. Spiezio, 105 Ill. App. 3d 769, 771, 434
N.E.2d 837 (1982) (reversible error to admit evidence of auto
theft in burglary case).
 In this case, evidence that the defendant might have been 
committing a weapons felony every day for more than two years
bore no relevance to the murder charge being tried. Much like
the prosecutor's repeated use of the terms "mug shot" and "mug
book" in People v. Graham, 179 Ill. App. 3d 496, 534 N.E.2d 1382
(1989), the only purpose of the evidence was to unfairly
prejudice the defendant in the minds of the jurors.
 (b) The prosecutor asked the defendant questions about his
"associates."
 During his direct examination, the defendant testified to
disposing of the weapon he used to shoot Tyree West, and later
calling a lawyer. On cross-examination by the prosecutor:
 "Q. What sort of people tell you that when you
 shoot somebody you get rid of the gun?
 [Defense counsel:] Objection.
 THE COURT: Overruled.
 A. Robbery, murderer.
 Q. I am sorry.
 A. I said, robbery, murderer, people I know, just
 people.
 Q. Friends of yours, robbers and murderers, people,
 friends of yours?
 A. No, associates.
 Q. Now, these robbers and murderers, associates of
 yours, are they the ones that told you that you should
 ask for a lawyer when you are questioned by police?
 A. Yes."
 A defendant should be able to exercise his Sixth Amendment
right to counsel without deprecation or belittlement. People v.
Meredith, 84 Ill. App. 3d 1065, 405 N.E.2d 1306 (1980). These
questions represented an unwarranted attack on the defendant's
decision to contact a lawyer. Standing alone, the questions
would not rise to the level of reversible error. We do not,
however, consider them in isolation.
 (c) The prosecutor extensively examined the defendant about
his use of an assumed name in another case.
 Faced with the trial judge's ruling on the admissibility of
prior convictions, the defendant testified on direct to his
criminal record. He said he was the "same Columbus McGee who
also used the name of ***Willie Killerese***who on July 1st,
1992, was found guilty of the offense of possession of a
controlled substance." The prosecutor used that opportunity to
ask several questions that far exceeded the scope of the direct
examination and that entered territory having nothing to do with
the limited purpose for admission of the prior convictions:
 "Q. Why did you use the name Willie Killerese, sir?
 A. Because I was on parole and I was scared that I
 was going to get locked up. I wasn't going to be able to
 get out.
 Q. Scared again? Now, your correct name is Columbus
 McGee, is that true?
 A. Yes.
 ***
 Q. Is that the case you got the probation on, the
 last case?
 A. Yes.
 Q. Because you changed your name to Willie Killerese?
 [Objection overruled.]
 Q. You changed your name from Columbus McGee to
 Willie Killerese hoping that you might get probation and
 not get your parole violated, is that right?
 A. Yes.
 Q. So you lied?
 A. Yes."
 The use of an assumed name during a prior arrest had nothing 
to do with the shooting of Tyree West. The prior conviction came
in for the limited purpose of attacking testimonial
believability. The defendant made no attempt on direct
examination to explain either his prior conviction or the use of
the false name. Evidence of the use of an alias is admissible
"only if material to some issue in the case." People v. Coleman,
158 Ill. 2d 319, 339, 633 N.E.2d 654 (1994).
 It is true that the defendant's credibility became an issue
in the case. But in this State specific instances of
untruthfulness are not admissible to attack a witness's
believability. People v. West, 158 Ill. 2d 155, 632 N.E.2d 1004
(1994); Cleary & Graham's Handbook of Illinois Evidence, sec.
608.5 (6th ed. 1994).
 The prosecutor's questions went too far. And the theme was 
picked up again during the prosecution's rebuttal argument:
"***he has just lied to the judge to get on probation, lied about
his name, lied to stay out of prison***"
 None of these instances of prosecutorial excess would,
individually, result in reversal given the evidence in this 
case. We view them in conjunction with the trial court's failure
to conduct a proper Montgomery weighing test. While the evidence
was sufficient to support the first degree murder verdict, we
note that the jury also was instructed on self-defense and second
degree murder. The jury was entitled to weigh the defendant's 
believability on those issues without being deterred by improper
considerations. Basic fairness requires no less.
CONCLUSION
 For the reasons stated, we reverse the defendant's
conviction and remand this cause for a new trial.
 REVERSED AND REMANDED.
 McNAMARA and CERDA, JJ., concur.