**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220336-U

Order filed August 4, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0336 Circuit No. 16-CF-2515 |
| WILLIAM J. MCGUIRE JR., | ) ) ) | Honorable Daniel Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court.
Justice Hettel concurred in the judgment.
Presiding Justice Holdridge specially concurred.

**ORDER**

¶ 1     *Held*:  The evidence did not prove beyond a reasonable doubt that defendant was armed with a dangerous weapon other than a firearm when the only witness unequivocally testified the attacker had a gun. The evidence proved beyond a reasonable doubt that defendant was the person who entered the home and attacked the victim based on cumulative circumstantial evidence.

¶ 2     The State charged defendant with one count of home invasion with a bludgeon (720 ILCS 5/19-6(a)(1) (West 2016)) (count I), two counts of home invasion with a firearm (720 ILCS 5/19-6(a)(3) (West 2016)) (counts II and III), one count of unlawful use of a weapon by a felon (720

ILCS 5/24-1.1(a) (West 2016)) (count IV), and one count of criminal trespass to residence (720 ILCS 5/19-4(a)(2) (West 2016)) (count V). After a bench trial, the trial court found him guilty of counts I, II, and V. He was later acquitted of count II after the court partially granted his motion to reconsider. The court sentenced defendant to concurrent prison terms of 25 years on count I and 2 years on count V. On appeal, defendant argues the evidence did not prove beyond a reasonable doubt that he was guilty of home invasion with a weapon other than a firearm, and he was not proved beyond a reasonable doubt as being the person who attacked the victim, Sharon Davis. We reverse in part and affirm in part.

¶ 3                                          I. BACKGROUND

¶ 4        On September 28, 2016, at approximately 1:45 p.m., Davis returned to her Bolingbrook townhome after running errands at Bob's Discount Furniture Store and Jewel-Osco. The doorbell rang, and she assumed it was the homeowner association's painter. As she unlocked the door, the door flew open, and a large man with a handgun in his right hand was standing there, growling. The man put the gun to Davis's head. Davis grabbed the gun with her left hand and turned it toward his face instead. The man knocked her feet out from under her, came down on top of her, and grabbed at her clothes. Davis scooted back across the floor, kicking and hitting the man with her fists. Davis managed to kick the man off and run out the back door into her backyard. That was the last time she saw the man in her house. Her neighbors heard her screams and met her in their shared backyards. The police arrived shortly thereafter.

¶ 5        Davis's neighbors, Elizabeth Gigler and Therese Mikulecky, did not see the attacker, but both testified they saw Davis running and heard her scream, "He has a gun!" Davis testified she is familiar with guns, and the attacker had a black automatic gun.

2

¶ 6        Davis described her attacker as a white, balding man, approximately six feet tall, between 50 and 60 years old, and wearing a blue crewneck sweatshirt with jeans, a dark gray stocking cap (like a winter hat), and brown oversized women's sunglasses that covered much of his face. As she was talking to police, she remembered there was a man following her while she was shopping at Jewel-Osco, and she realized this was the same man that attacked her. While in Jewel-Osco, a man, who was approximately six feet tall, weighed over 200 pounds, and wearing a blue crewneck sweatshirt, approached her in the liquor department and said "hi" to her. She did not recognize the man. She encountered him at least three more times in the store. She realized the man following her was the same man as the intruder because both were six feet tall with chubby cheeks and a large stomach, wearing the same sweatshirt.

¶ 7        The police collected Davis's clothes, cut her fingernails, swabbed her mouth for deoxyribonucleic acid (DNA) testing, and dusted for fingerprints in her home. On November 7, 2016, 40 days after the attack, Davis went to the police station for a photo lineup, which was videorecorded. The recording was admitted into evidence. The photo array contained six headshots of men between the ages of 50 and 60. Davis spent 16 minutes analyzing the photos. She eliminated four photos, narrowing it down to two. The police told her she did not need to make a decision. She was focused on "chubby cheeks," because she described her attacker and the man in Jewel-Osco having "chubby cheeks." She ultimately wrote "75%" under defendant's photo and "25%" under the remaining photo. Near the end of the recording, she mentioned "fingerprints and DNA at my house." Davis later testified that her hesitation during the photo lineup was because she did not want to pick out the wrong person, and it would have been helpful if she saw more than a headshot so she could see the subjects' height. On December 5, 2016, police showed Davis a picture of defendant from the Jewel-Osco security footage. Upon viewing defendant's picture,

3

Davis identified defendant as the man who followed her in Jewel-Osco and attacked her in her home.

¶ 8    In December 2016, the police executed a search warrant on defendant's home in Carol Stream. Detective Jason Mitchem secured the residence and watched the occupants inside while the search was being conducted. He heard defendant ask, "Is this about the townhome thing?"

¶ 9    Detective Michael Harvey, the case's lead investigator, asked defendant if he was in Bolingbrook on September 28, 2016. Defendant did not remember. He then asked if defendant had any reason to be in Bolingbrook, and defendant answered "yes," stating he owned a rental unit in Plainfield that he was cleaning. Defendant could not remember which route he took to Plainfield that day. Harvey asked defendant if he stopped anywhere that day. Defendant did not know but said he may have stopped for a soda. Harvey then asked defendant if he had stopped at Jewel-Osco that day, and defendant admitted he did. Harvey showed defendant pictures of himself from the Jewel-Osco security footage wearing a blue crewneck sweatshirt, and defendant said, "It's me, move on." According to Harvey,

> "[Defendant] kept asking what is this about. What is this about. And then I said, well, Bill, it's about following a woman. And he sighed, got flushed in the face, and looked down and said, 'it's about attacking a woman.' And I said, 'Bill, I was talking about following, you know, I said following a woman.' He said, 'I need a lawyer. I'm done talking.' "

¶ 10    The police seized two computers from defendant's home. The computers contained search terms and video titles, including, among others, "Milf tied forced," "stalking abducting milf gif tumblr," and "intruder forced milf gif." The police also seized two blue crewneck sweatshirts, one of which matched the color of the sweatshirt defendant was wearing in the Jewel-Osco security

4

footage. In addition, they found multiple pairs of brown oversized women's sunglasses. The police did not find a firearm, gray knit hat, rope, or handcuffs.

¶ 11    Harvey also obtained video footage from Bob's Discount Store dated September 28, 2016, showing a gray Subaru Forrester matching defendant's vehicle drive northbound through the parking lot in front of the store. Davis walks into the store approximately one minute later. Harvey testified defendant had a flip phone. Unlike a smartphone that activates frequently with cell towers, a flip phone is only activated with a cell tower when there is a call or text message. On September 28, defendant made one phone call from his flip phone near the Fox Valley Mall, approximately 21 minutes after the incident occurred in Davis's home. Harvey drove the route twice from Davis's home to the location near the mall, with one trip taking 20.5 minutes and the other trip taking 21 minutes.

¶ 12    Detective Steven Furtek photographed the scene and dusted for fingerprints at the front and rear doors. He was unable to obtain any print results. Forensic biologist Katherine Sullivan testified there was very limited male DNA compared to female DNA on Davis's fingernail clippings, and defendant was excluded from the male DNA result. Defendant's expert, forensic scientist Karl Reich testified there was no physical evidence linking defendant to any of the tested items in this case. Specifically, hairs found on Davis's clothes excluded defendant as the source, and he was excluded as the source of male DNA under her fingernails.

¶ 13    The parties stipulated the Federal Bureau of Investigation (FBI) excluded defendant as the source of the hairs collected from Davis. The FBI also compared fibers recovered from Davis to fibers in the blue sweatshirt found in defendant's home. The fibers were consistent with originating from the sweatshirt, but "a fiber association is not a means of positive identification and the number of possible sources for a specific fiber is unknown."

5

¶ 14          Defendant's other expert, Dr. Deryn Strange, a specialist in the field of memory distortion, testified that a victim's ability to identify the perpetrator diminishes "by a reasonable amount" in the presence of a weapon. Dr. Strange explained that the victim's fixation on the weapon detracts from the time the victim needs to encode the perpetrator's facial features. She stated that researchers have found that people who recognize gaps in their memory following an event are motivated to fill in those gaps. She also explained a type of memory distortion where a person not involved in a violent encounter may be incorrectly linked to the encounter simply because that person was a "focal point relatively close in time to the encounter." Dr. Strange distinguished between recognition memory and comparative judgment. Regarding recognition memory, she stated,

> "We know from studies where recognition memory has been looked at with relation to decision speed and identification procedure, that if a person is taking longer than eight seconds to decide whether or not a person is the person who committed the crime, then they are likely to be wrong. Accuracy falls off a cliff after eight seconds."

As for comparative judgment, she explained it is used when a person is comparing two individuals, and unlike recognition memory, it is more likely to cause a misidentification. Dr. Strange opined Davis was not using recognition memory during the photo lineup: "She takes a very long time and she's talking aloud about choosing between two people, so that is absolutely a comparative judgment and definitely not recognition memory." Dr. Strange also explained how an eyewitness's memory could become increasingly more distorted due to the "feedback effect":

> "So if after they have identified somebody, somebody is arrested, the case goes to trial. It's not just that the eyewitness's confidence then increases, their

6

interpretation of the actual event changes. So they start saying that they had a better look at the assailant, that they were with them for a longer period of time, that the viewing conditions were better than they actually were. This is called the feedback effect."

According to Dr. Strange, the only meaningful confidence is the confidence expressed at the time the identification is made. "Highly confident people at the time that they made the identification are more likely to be accurate, all other things considered. When they are not expressing a great deal of confidence, then it's much more likely to be inaccurate."

¶ 15 The court found defendant guilty of counts I, II, and V. In ruling, the court stated, "This case is close. This is not an easy decision. Either way. However, at the end of the day, the Court, having reviewed all the evidence in this case, finds that the circumstantial evidence is—in this case is cumulative to the point of which I find the defendant guilty." The court explained Davis's identification was not perfect, but the cumulativeness of the circumstantial evidence led it to believe defendant was guilty beyond a reasonable doubt.

¶ 16 Defendant filed a posttrial motion, contending the court's finding of guilt on count II, which alleged he was armed with a firearm, was inconsistent with the court's findings of not guilty on counts III and IV, which also alleged the use or possession of a firearm. The court vacated its finding on count II and sentenced defendant to concurrent prison terms of 25 and 2 years on counts I and V, respectively. This appeal followed.

¶ 17                                                    II. ANALYSIS

¶ 18 On appeal, defendant challenges the sufficiency of the State's evidence to sustain both of his convictions. He maintains Davis's identification of him was unreliable and did not establish him as the person who attacked her. In addition, as to count I (home invasion with a bludgeon),

7

defendant argues there was no evidence of the offender being armed with anything other than a firearm, and therefore he was not proved guilty beyond a reasonable doubt of being armed with a weapon other than a firearm. We first address the latter argument.

¶ 19                    A. Dangerous Weapon Other Than a Firearm

¶ 20        Generally, "[w]hen a court reviews a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22. All reasonable inferences favoring the State are allowed; unreasonable or speculative ones are not. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 21        Despite this generally deferential standard of review, defendant maintains we should review this issue *de novo*. We agree. Whether a particular item comes within the definition of a statutory term is reviewed on a *de novo* basis. *People v. Westmoreland*, 2013 IL App (2d) 120082, ¶ 14. Additionally, when a defendant disputes whether the uncontested facts were sufficient to prove the elements of an offense, appellate review is *de novo*. *People v. Perkins*, 408 Ill. App. 3d 752, 757-58 (2011).

¶ 22        Defendant's contention requires us to construe subsection (a)(1) of the home invasion statute (720 ILCS 5/19-6(a)(1) (West 2016)), which sets forth a type of home invasion in which the offender is armed with a dangerous weapon "other than a firearm." According to defendant, there was no evidence that Davis's attacker was armed with anything other than a firearm, and no evidence was introduced of any item that could be described as a bludgeon. He maintains that to sustain a conviction for count I, the State needed to prove (1) illegal entry into an occupied

8

residence; (2) the presence or use of a dangerous weapon; and (3) the dangerous weapon was not a firearm.

¶ 23     The State argues whether defendant possessed a bludgeon was a question of fact for the trial judge to determine. It further argues that an item can be labeled a firearm but also described or labeled as a "bludgeon," as this description is based on how the item is used during the commission of the offense. According to the State, the statutory phrase "other than" means "in addition to someone or something," which does not exclude a firearm from being considered a dangerous weapon. We find the State's argument misplaced.

¶ 24     According to the home invasion statute,

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present *** and
>
> (1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs, or
>
> ***
>
> (3) While armed with a firearm uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs[.]" 720 ILCS 5/19-6 (West 2016).

In *People v. Booker*, 2015 IL App (1st) 131872, the court observed that the subsections of the home invasion statute and their respective allegations are mutually exclusive:

"[T]he home invasion statute distinguishes between the commission of the offense 'with a firearm' from the commission of the offense 'with a dangerous weapon other than a firearm' by ascribing those two factors to different subsections of the statute. *** [T]he allegation that defendant was armed with a dangerous weapon *other* than a firearm cannot be reasonably inferred from the allegation that defendant was armed with a firearm, because the latter necessarily excludes the former." (Emphasis in original.) *Id.* at ¶ 59.

In reaching this conclusion, the court in *Booker* reviewed cases analyzing the vehicular hijacking and armed robbery statutes with the same "other than a firearm" language. See *id.* at ¶ 58. Our supreme court, after discussing the vehicular hijacking and armed robbery statutes containing the same exclusionary language, concluded that based on the plain language, offenses committed with firearms and offenses committed with weapons other than firearms are mutually exclusive of each other. *People v. Clark*, 2016 IL 118845, ¶ 43.

¶ 25    The State relies on *People v. Miles*, 2017 IL App (1st) 132719, to argue the use of the phrase "other than" does not exclude a firearm from being a dangerous weapon. The State's argument misses the target. First, the classification of a firearm as a dangerous weapon is not in dispute. The question is whether the home invasion statute treats firearms and other dangerous weapons as mutually exclusive categories. We have determined that it does. "When interpreting a statute, we do not read a portion of it in isolation; instead, we read it in its entirety, keeping in mind the subject it addresses and the drafters' apparent objective in enacting it." *Id.* ¶ 25. Second, *Miles* is distinguishable because it dealt with statutory language that did not include the qualifying clause "other than a firearm." See *id.* at ¶ 9 (quoting armed robbery statute). Ultimately, the issue here is whether defendant can be convicted of home invasion with a weapon other than a firearm

10

(a bludgeon) when there was only evidence of the attacker being armed with a firearm, and defendant was acquitted of all firearm charges.

¶ 26    As we have established, the home invasion statute creates two mutually exclusive categories of weapons: (1) firearm, and (2) dangerous weapon other than a firearm. See *Clark*, 2016 IL 118845, ¶ 43. The analysis could end there. But even so, disregarding *Clark*, we recognize there are instances when a gun may be used as a bludgeon, however, there is no evidence—such as the weight or composition of the object defendant had or that he brandished it as a bludgeon— to support such a conclusion in this case. See *People v. Ross*, 229 Ill. 2d 255, 276-77 (2008); *People v. Harris*, 2015 IL App (1st) 133892, ¶ 24; *People v. Thorne*, 352 Ill. App. 3d 1062, 1073 (2004). Here, Davis testified she is "very" familiar with firearms and can tell the difference between different types of firearms. She testified that an attacker pointed the gun at her. She grabbed the gun and pointed it back at him. Her neighbors heard her scream, "He has a gun!" She told multiple police officers that the attacker had a gun. She described the gun as a black automatic. "A firearm cannot simultaneously be a firearm and something other than a firearm in the same way that a square cannot simultaneously be a circle and something other than a circle. It is logically impossible." *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 40. Therefore, defendant was not proved guilty beyond a reasonable doubt of home invasion with a dangerous weapon other than a firearm, and we reverse defendant's conviction on count I.

¶ 27                                B. Identification

¶ 28    Defendant also contends Davis's identification of him was not reliable and was not sufficient to sustain the court's guilty finding on count V (criminal trespass to residence). "The prosecution has the burden of proving beyond reasonable doubt the identity of the person who committed the crime." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "An identification will not be

11

deemed sufficient to support a conviction if it is vague or doubtful." *Id.* When reviewing the sufficiency of the evidence, a reviewing court must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. A criminal conviction will not be overturned "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 29 "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Slim*, 127 Ill. 2d at 307. "However, it is equally well established that a conviction cannot be sustained beyond a reasonable doubt solely by an identification of the accused which is vague, doubtful, or uncertain." *People v. Graham*, 179 Ill. App. 3d 496, 506 (1989). In determining whether an identification is reliable, the factors to consider in evaluating the likelihood of misidentification, termed the *Biggers* factors, include (1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the witness's level of certainty at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

¶ 30 Defendant argues the *Biggers* factors weigh in his favor: (1) Davis had a short opportunity to observe the attacker in her house, (2) her degree of attention was at best divided due to her focus on the gun, (3) her description of the attacker was vague and lacked specificity, (4) she did not initially identify her attacker as the person from Jewel-Osco, but later came to that conclusion, and (5) her level of uncertainty was apparent from her attempted identification of defendant more than one month after the attack. Further, defendant asserts, the physical evidence exonerated him: hair

12

collected from Davis's shirt did not belong to defendant, defendant was conclusively excluded as the source of male DNA under Davis's fingernails, and there was no evidence of bruises, cuts, or scratches on defendant. Defendant contends the trial court relied on factors which did not place defendant at the scene of the attack, while ignoring the expert testimony about the problems with witness identification and memory distortions, and also ignoring expert testimony regarding the physical and DNA evidence that was recovered.

¶ 31    The State argues the totality of the circumstances of Davis's identification of defendant sufficiently and reliably established defendant was the individual who attacked her in her home. Davis described her assailant as wearing a blue crewneck sweatshirt, jeans, a dark gray stocking cap, and brown oversized women's sunglasses that covered much of his face. The attacker was six feet tall with big chubby cheeks and a large stomach. Despite a most horrifying and stressful situation, her ability to meticulously describe the nature of the attack and her reactions to it establishes her degree of attention. Moreover, only 40 days passed before Davis viewed the photo lineup and only 69 days had passed when she made the second identification (in the Jewel-Osco surveillance footage). Considering the nature of the attack, it is not surprising that there was no physical evidence belonging to defendant: there was no evidence defendant touched anything to leave a fingerprint, no hair was found because he was wearing a stocking hat, there was no evidence Davis scratched the attacker so there would be no DNA under her fingernails, and the lack of physical injury to defendant is consistent with Davis's testimony.

¶ 32    We begin by considering the *Biggers* factors to determine the reliability of Davis's identification of defendant during the photo lineup. First is the opportunity Davis had to view the attacker at the time of the attack. In *Graham*, the witness had an excellent opportunity to view her attacker at the time of the robbery when she viewed her attacker face-to-face from about one foot

away directly beneath parking lot lights, watched him back away slowly, and saw his face again when he left the parking lot. *Graham*, 179 Ill. App. 3d at 505. Conversely, the fact that two witnesses only viewed the suspect's face for a few seconds and did not previously know the suspect did not greatly favor the State. *People v. Piatkowski*, 225 Ill. 2d 551, 568 (2007). Here, the crime occurred in daylight hours. Davis briefly fought with her attacker before she was able to escape out her back door. But the attacker was wearing large sunglasses that covered most of his face. We conclude this factor does not greatly favor either the State or defendant.

¶ 33    The second factor is Davis's degree of attention. In *Graham*, the witness's degree of attention was acute enough to remember what the man she saw when she entered the parking lot was wearing and to realize her attacker was the same person, considering she had no forewarning of being attacked and she was only able to focus her attention on the attacker's face after relinquishing her briefcase. *Graham*, 179 Ill. App. 3d at 505. But in *Piatkowski*, witnesses were not paying a great deal of attention to the driver's appearance when they did not know they would be fired upon, were not attempting to assess his appearance for a later identification, and had no opportunity to view the suspects after the shooting began. *Piatkowski*, 225 Ill. 2d at 568. Here, Davis was able to describe the events of the attack and her attacker's "chubby cheeks." However, according to Dr. Strange's testimony, Davis's attention was at least partially divided due to the presence of a gun. Davis testified she did not want the gun pointed at her and was focused on getting out of the house. We find this factor does not weigh greatly in favor of either the State or defendant.

¶ 34    The third factor is the accuracy of Davis's prior description of the attacker. "The presence of discrepancies or omissions in a witness's description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made." *People v. Davis*,

14

2018 IL App (1st) 152413, ¶ 56. "It has consistently been held that a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness's positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." *Id*. Here, Davis's prior descriptions of her attacker were consistent, even if they were somewhat general. This factor weighs in favor of the State.

¶ 35        The fourth factor is the level of certainty demonstrated by Davis during the photo lineup. In *People v. Corral*, 2019 IL App (1st) 171501, the evidence demonstrated the witness identified defendant definitively in a photo array and lineup when he identified defendant within three seconds of viewing the photo array and between five to ten seconds upon viewing the lineup, which was corroborated by the detective who testified that the witness identified defendant immediately. *Id.* ¶ 80. Here, Davis did not make an immediate identification, but instead spent 16 minutes narrowing down the photos. She ultimately settled on it being 75% likely defendant was her attacker and the man following her in Jewel, with a 25% chance belonging to another photo. She seemed to take comfort in the fact that investigators collected physical evidence at her home. She testified that her uncertainty was due to not wanting to misidentify, and also it would have been helpful in her identification to see how tall the individuals were. Her uncertainty during the photo lineup weighs in favor of defendant.

¶ 36        The last factor is the length of time between the attack and the photo lineup. A time difference of four weeks between the crime and the identification confrontation does not invalidate the reliability of the identification. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 33. Illinois courts have upheld convictions involving much longer delays. See *People v. Holmes*, 141 Ill.2d 204, 242 (1990) (identifications with lapses of 18 months, 2 years, and 2 ½ years between the

15

crime and identification have been reliable). Here, Davis was presented with the photo lineup 40 days after the attack. The time difference of 40 days weighs in favor of the State.

¶ 37 Illinois courts have upheld less than perfect identifications. In *People v. Taylor*, 143 Ill. App. 3d 252 (1986), the defendant claimed he was not proved guilty beyond a reasonable doubt because his conviction rested solely on vague, doubtful, and uncertain identifications of two victims. *Id.* at 253. During a photo lineup the day after the offense, both victims independently chose a photo of the defendant as the man who robbed them. *Id.* at 254. At a subsequent lineup, one victim was unable to identify anyone, but stated she was about 80% certain the defendant was the man who robbed her. *Id.* She stated that she failed to identify anyone because the officers conducting the lineup cautioned her to be absolutely certain before picking anyone. *Id.* The second victim initially narrowed the choice down to two men, then hesitated a long time before picking the defendant. *Id.* The court found these to be positive identifications. *Id.* at 255. "Although the witnesses were at times somewhat hesitant, they consistently identified the defendant as the robber." *Id.*

¶ 38 Similarly, we find that although Davis did not make a perfect identification, she still positively identified defendant as her attacker. The cumulative amount of circumstantial evidence corroborates Davis's identification. "It is well settled in Illinois that a conviction can be sustained solely on circumstantial evidence." *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 55. Based on Davis's description of events, the lack of physical evidence tying defendant to the attack is reasonable. She did not testify that she scratched her attacker, so there would be no DNA evidence under her fingernails. The attacker was wearing a hat covering his hair, which is a reasonable explanation for why his hair was not found on Davis's clothing. Further, police executed the search warrant on defendant's home months after the attack, so any evidence of injury would likely be

16

healed. Defendant admitted he was at Jewel-Osco, and video footage shows him following Davis. He made a phone call 21 minutes after the attack at a location that was 21 minutes away from Davis's townhome. Police found suggestive searches on his computer for "milf tied forced" and "intruder forced milf." Most striking are the statements he made to police during the execution of the search warrant: "Is this about the townhome thing?" and "It's about attacking a woman." One piece of this circumstantial evidence is not enough, but taken together, it was not unreasonable for the trial court to find defendant guilty of criminal trespass to residence beyond a reasonable doubt. See *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19. We affirm defendant's conviction on count V.

¶ 39                                          III. CONCLUSION

¶ 40        The judgment of the circuit court of Will County is reversed in part and affirmed in part.

¶ 41        Reversed in part and affirmed in part.

¶ 42        PRESIDING JUSTICE HOLDRIDGE, specially concurring:

¶ 43        I concur but write separately to recognize there is no justice for the victim in this case. The trial court found the evidence substantial enough to conclude the defendant committed the attack, a very serious offense. We, however, must reverse the defendant's conviction on count I because of how the case was charged and the evidence presented. The State failed to prove the defendant guilty of the charged offense and now, he will serve very little time. This is not a just result, but a legal one, nonetheless.