2026 IL App (1st) 242289

FIFTH DIVISION
May 15, 2026

No. 1-24-2289

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2023 CR 6006401 |
| | ) | |
| CHRISTOPHER HALEY, | ) | Honorable |
| | ) | Ursula Walowski, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE WILSON delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Christopher Haley was convicted of home invasion while armed with a dangerous weapon other than a firearm (720 ILCS 5/19-6(a)(1) (West 2022)) and was sentenced to eight years' imprisonment. On appeal, he argues that the State failed to prove beyond a reasonable doubt that he was armed with a dangerous weapon other than a firearm and that trial counsel was ineffective for failing to propose an appropriate response to the

jury's questions. For the following reasons, we reverse the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3      Christopher Haley was charged by indictment with two counts of home invasion, one count of residential burglary, two counts of unlawful restraint, and two counts of aggravated unlawful restraint after he unlawfully entered the home of Martha Lakes with a firearm. The State proceeded to trial on the two counts of home invasion. Count I alleged that he was armed with a firearm, and count II alleged that he was armed with a bludgeon. The indictment also indicated that the State would seek an extended term sentence because Lakes was a person over the age of 60 years old.

¶ 4      Lakes testified at trial that she was 73 years old at the time of the incident and lived at 4941 West Van Buren in Chicago with her daughter; her two sons, Patrick Lakes and Jeremy Ward; and her five grandchildren, Gabrielle, Xzaariah, Princess, Taelor, and London. When Taelor got home from school on November 4, 2022, she was upset and was talking to Lakes in the basement. At that time, the front door to the residence was locked and not damaged in any way. After Lakes and Taelor finished their conversation, Haley kicked in the front door of the residence and went down to the basement. The door was damaged, and the glass was broken. She testified that he had a black gun in his hands; said, "I am tired of you messing with my kids"; and threatened to shoot and kill Lakes and her family. Haley had both hands on the gun and was pointing it from Lakes to each of her sons. After Haley left, Lakes walked out behind him because she heard yelling and screaming outside. Lakes saw three women and two children outside. Lakes recognized one of the women from a meeting she had at Taelor's school in the fall of 2022. Lakes went to Taelor's school due to a "dispute" between Taelor and another girl

named Tashawna.[1] Tashawna was the daughter of Haley's significant other, Taquaraa Wilson. Lakes identified Haley in open court. She also identified Haley in a photo array at the police station.

¶ 5     The women that were standing outside were yelling for Lakes to send her daughter and Taelor outside. Lakes saw that they had a butcher knife, a crowbar, and a hammer. The women remained there until the police arrived. Lakes saw some damage to the door jamb on her front door that was not there prior to Haley breaking in.

¶ 6     Taelor testified that, at the time of the incident, she was eight years old. At that time, she was having problems with a girl in her third-grade class named Tashawna. Tashawna pushed Taelor to the floor at recess. As a result, Taelor met with the school principal, Tashawna, and Tashawna's mother about it.

¶ 7     On November 4, 2022, while Taelor was walking home from school with her two sisters, Tashawna said something to Taelor that made Taelor feel scared. When Taelor got home, she went into the basement to talk to her grandmother. Afterwards, she went to her room and while she was there, she heard a man enter the home. She peeked out her bedroom door and saw a man and two women. The man was holding a black gun. Taelor then went halfway down the stairs and saw the man in the basement. The man was holding a black gun and yelling. Taelor hid under her bed and called the police.

¶ 8     Gabrielle Randle testified that she was 16 years old and living at the residence with her grandmother, uncles, mother, and cousins on November 4, 2022, the day of the incident. At about 3:45 p.m., Gabrielle was upstairs when she heard someone knocking very loudly at the

---

[1]Tashawna is also spelled Tishana in the record

door. As she was walking down the stairs, the front door "busted—it flew open," and Haley came in with a gun "pointed." Gabrielle identified Haley in open court. She testified that she ran down the stairs to the basement to try and protect her grandmother and that Haley followed her. He held a black gun with both hands, pointed it at Gabrielle, her grandmother, uncles, and cousin Xzaariah, and threatened to kill them. Haley said that he would "blow [their] heads off." Gabrielle stood in front of her grandmother to try to protect her. She heard shouting outside and saw three women in the front of the house with a crowbar, knife, and hammer. Haley eventually left, and Gabrielle tried to close the door but could not because "he broke the door." The women remained outside the home trying to fight Gabrielle until the police arrived. Gabrielle took photos of the women with her phone.

¶ 9      Xzaariah Kelley testified that she was 16 years old and lived at the residence with her cousins, sisters, uncles, grandmother, and aunt on the date of the incident. At approximately 3:45 p.m., she was in the basement laundry room when she heard her family members screaming. She went to the front of the basement to see what was going on and saw Haley standing there with a black gun in his hand, waving it at her grandma, uncles, and cousin Gabrielle. Xzaariah identified Haley in open court. Haley threatened to kill them. Xzaariah then ran back to the laundry room, closed the door, and called the police. She left the basement after about five minutes and went to find her sisters, Taelor, London, and Princess. Xzaariah found them under their bed crying. She called the police a second time. While she was waiting for the police to arrive, Xzaariah looked out the window and saw three women with a hammer, a butcher knife, and a crowbar in their hands. Xzaariah identified Haley in a photo array at the police station.

¶ 10     Chicago police detective Guy Dailey testified that Taelor, Gabrielle, and Martha

4

identified Mr. Haley in a photo array. Chicago police officer Jose Alvarez testified that, as the evidence technician, he discovered a black and yellow crowbar directly in front of the door on the sidewalk, a red and black hammer on the front lawn of the property, and a knife in the grass in the parkway of the house on the other side of the sidewalk. Forensic scientist Cynthia Engelking Prus testified that she did not find any latent prints on the recovered items. Chicago police officer Anthony Valentino was able to obtain security camera footage from a neighbor who lived at 4932 Van Buren. The timestamp on the surveillance video was slow by approximately 11-minutes and 32-seconds. Chicago police officer Manuel Gonzalez was able to obtain police observation device (POD) camera video that was located near the 4900 and 5000 blocks of West Van Buren.

¶ 11    Detective Adrian Lally of the Chicago Police Department responded to Lakes's residence within an hour of the incident and observed that the front door of the building was open and had some damage. A black and yellow crowbar was recovered on the sidewalk, directly in front of the door to the residence. A red and black hammer was located on the front lawn, and a knife was located on the spot of grass between the sidewalk and street.

¶ 12    As part of his investigation, Detective Lally requested private surveillance camera footage from a neighboring residence. A clip of that footage, time-stamped 3:40 p.m., showed three adult women, along with two girls, walking towards Lakes's residence. About 10 minutes later, the video shows the group walking away. Detective Lally also requested POD footage from a camera located in the area for the time of the incident and earlier in the day. A clip of that footage, at 3:50 p.m., showed three adult women and two girls exit a residence and walk towards Lakes's residence. The footage then showed Haley, wearing a grey camouflage jacket and bright

yellow shirt, exiting that same residence and walking towards Lakes's residence. The video showed Haley crossing the street with a hammer in his right hand. A different view of that same footage showed the five women exit their residence and walk towards Lakes's residence, followed by Haley, who was carrying a hammer and crowbar in his left hand. A clip from approximately 3:47 p.m. showed Haley walking away without a hammer or crowbar in his hand.

¶ 13    Detective Lally had a conversation at the police station with Haley, after he was arrested. Haley was "Mirandized" (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and the conversation was video and audio recorded. During that conversation, Haley stated that he lived at 4840 West Van Buren in Chicago. Haley told Detective Lally that Taquaraa Wilson was his girlfriend and that Tashawna was her daughter. Haley stated that he was aware of an incident involving Tashawna and a girl who lived down the street, but he denied going to the girl's residence.

¶ 14    The State rested. Haley's motion for a directed verdict was denied.

¶ 15    Taquaraa Wilson testified on behalf of Haley. She stated that she lived at 4840 West Van Buren, the same street as Lakes, with Haley; her two children, ages 6 and 8; her mother; her cousin; and her aunt. Prior to the incident in question, she had attended a meeting at her daughter's school with Lakes about bullying. At that meeting, Lakes told her to come by her residence to discuss the kids fighting in the future.

¶ 16    Wilson stated that she went to Lakes's residence on November 4, 2022, at approximately 3:40 p.m., with her mom and her two kids because she wanted to speak to Lakes about the girls fighting. Wilson stated that she was upset and "wanted to get to the bottom of this." She called Haley and told him she was going to the residence. She went there with her mother and two children, and her aunt joined them later. She denied bringing any weapons with her.

¶ 17    When Taquaraa arrived at the residence, she knocked on the door and heard whispering behind the door. When she knocked on the door again, Lakes and a younger woman answered and stood in the threshold between the outside and inside of the residence. Taquaraa spoke with Lakes about the girls fighting, and then the younger woman started yelling at her. She then saw that the younger woman had a kitchen knife with frosting on it and was holding it at her waist. Taquaraa testified that Lakes and the younger woman were "talking very aggressive to [her] and they weren't trying to hear what [she] was saying."

¶ 18    According to Taquaraa, Haley arrived at the residence a short time later, but he did not enter the residence or point a gun at anyone. Taquaraa testified that she did not see Haley with a gun. She further stated that at no point in time did she, her mother, or her aunt have a crowbar, hammer, or any other type of weapon. When asked whether Haley had a hammer with him when he came to Lakes's house, she said she "saw him throw something down" at his feet in front of Lakes's home but she did not know what the object was. She stated that Haley left Lakes's residence before she did.

¶ 19    Taquaraa said the police came to her residence that day, but she did not answer any questions. Taquaraa testified that Haley did not do any maintenance to the Lakes's home and would have no reason to have a crowbar or hammer there.

¶ 20    Detective Lally testified during the State's rebuttal that when he interviewed Taquaraa in March 2023, he showed her a still shot of Haley holding a hammer, and she told him that Haley was a maintenance worker.

¶ 21    During closing arguments, the State argued, *inter alia,* that Haley was armed with a dangerous weapon other than a firearm because the POD footage clearly showed him exiting his

residence and walking towards Lakes's residence with a crowbar and hammer in his hand, both of which were dangerous weapons. The State also argued that, while armed with the hammer and crowbar, Haley used force or threatened the imminent use of force on a person within the dwelling place because marks on the door showed that the crowbar was likely used to pry open the locked door, which allowed Haley to enter and make threats to the family. Haley then left those items near the front of the residence. In addition, the State argued that "a firearm can sometimes be considered a bludgeon because a gun itself can be used to hurt people, even if you're not firing that gun."

¶ 22    In closing argument, defense counsel argued that the State's witnesses said that the women, and not Haley, had the hammer, knife, and crowbar and that Lakes testified that Haley kicked the door in, not that he used the crowbar. She also stated that the damage to the door was already there before Haley got there. Defense counsel likewise argued that there was no testimony that a hammer was used. With respect to the gun, defense counsel argued:

> "Where is the gun? Where is the gun? You never see a gun on any of the videos. There was no testimony or evidence that they searched his house and found a gun, or that they canvassed the area and found a gun, or that they found it in that blue pickup truck [defendant] was driving."

¶ 23    In rebuttal closing argument, the State argued that Martha Lakes testified that there was no damage to the door before the incident, but that there was damage afterwards. Further, the State pointed out that the damage on the door "somewhat suspiciously look likes it could come from the end of a crowbar." The State urged the jury to infer that no one inside the basement said that they saw defendant with a crowbar and a hammer "[b]ecause by then, he had used them, and

he tossed them to the ground, and pulled out the gun because that's what he was going to use inside." The State argued, "defendant didn't walk over there with a hammer and just decide to throw it to the ground. He walked over with that hammer and that crowbar to break into that house."

¶ 24　　During deliberation, the jury sent a question to the court which read, "in the second proposition, does entering the dwelling place require the defendant to physically enter the dwelling place? Would the breaking of the front door be considered the defendant entering the dwelling place?" The State responded that the appropriate response was to "send them back with, you heard the evidence, you have the law, please continue to deliberate." Defense counsel agreed. The court stated that the jury was asking a factual question and it was,

> "up to them to decide whether or not the defendant entered the dwelling—entered—entering the dwelling is—there's no legal definition of entering, it is a simple definition, so I don't find this is a legal question that can be answered with a legal definition, so both sides are correct that this is a question of fact the jury must decide. So the proper response is you have all the evidence and the law in the case. Please continue to deliberate. All right. I'll show it to both sides, both sides took a look. It's going to be—if both sides agree, that's what's going to be given to the sheriff and sent back to the jury"

¶ 25　　The jury found Haley guilty of home invasion while armed with a dangerous weapon other than a firearm (count II) and not guilty of home invasion while armed with a firearm (count I). Haley filed a motion for a new trial and incorporated a motion for judgment notwithstanding the verdict which were denied. Haley was sentenced to eight years in prison.

¶ 26    This timely appeal followed.

¶ 27                                II. ANALYSIS

¶ 28    Haley first argues that the State failed to prove beyond a reasonable doubt that he committed the offense of home invasion while armed with a dangerous weapon other than a firearm. He claims that the only evidence presented by the State was that he was armed *with* a firearm while inside Lakes' basement. However, the jury found him not guilty of home invasion while armed with a firearm. As such, his conviction for home invasion while armed with a dangerous weapon other than a firearm, a bludgeon, cannot stand.

¶ 29    In considering a challenge to the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. The trier of fact's role is to "assess the credibility of the witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102. A reviewing court will not substitute its judgment for that of the trier of fact with respect to those issues. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 30    Haley acknowledges that, generally, the standard of review for a reasonable doubt challenge is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. However, citing *In re Ryan B.*, 212 Ill. 2d 226, 231 (2004), he claims that because he is not

challenging the credibility of the witnesses, but rather questions whether the uncontested facts were sufficient to prove the elements of the offense, the proper standard of review is *de novo*.

¶ 31    The State disagrees and argues that *de novo* review is appropriate only where a defendant's challenge to the sufficiency of the evidence does not question the credibility of the witnesses, but instead questions whether the uncontested facts were sufficient to prove the elements of an offense. See *id.* Here, the State argues that because Haley's challenge to the sufficiency of the evidence questions the credibility of the witnesses and because key facts are in dispute, the *de novo* standard of review is not appropriate in this case.

¶ 32    We agree with the State that *de novo* review is not appropriate here, as *In re Ryan B.* is distinguishable. The issue in *In re Ryan B.* was whether the undisputed fact that the defendant asked a child to lift up her shirt constituted enticing, coercing, or persuading, for purposes of the sexual exploitation of a minor statute. *Id.* The court looked to the language of the statute to determine whether asking constituted coercing, enticing, or persuading and in doing so, the court applied *de novo* review. *Id.* at 231-32. The issue here is whether Haley entered Lakes's residence while armed with a dangerous weapon, a bludgeon, and used force or threatened imminent force upon Lakes, which is a question of fact. Accordingly, we review Haley's claim that the State did not prove him guilty beyond a reasonable doubt under the familiar standard that applies to sufficiency of the evidence claims.

¶ 33    Haley was charged with two counts of home invasion. In count I, he was charged with home invasion in that he was not a police officer when he knowingly entered the dwelling place of Lakes without authority, remained in the dwelling place until he knew or had reason to know people were present, and, while armed with a firearm, used force or threatened imminent force

upon Lakes within the dwelling place. 720 ILCS 5/19-6(a)(3) (West 2022). In count II, he was charged with home invasion in that he was not a police officer when he knowingly entered the dwelling place of Lakes without authority, remained in the dwelling place until he knew or had reason to know people were present, and, while armed with a dangerous weapon other than a firearm—to wit a bludgeon, used force or threatened imminent force upon Lakes. *Id.* § 19-6(a)(1). He was acquitted of count I and convicted of count II.

¶ 34    Resolution of Haley's argument requires examining the statutory distinction between firearm offenses and offenses involving dangerous weapons other than firearms. In *People v. Booker*, 2015 IL App (1st) 131872, ¶ 59, this court discussed the interplay of subsections (a)(1) and (a)(3) of section 12-11 of the Criminal Code of 1961 (referred to as the "home invasion statute") (720 ILCS 5/12-11(a)(1), (3) (West 2010), now codified in the Criminal Code of 2012 at 720 ILCS 5/19-6 (West 2022)), when it considered whether home invasion with a dangerous weapon other than a firearm was a lesser included offense of home invasion with a firearm. In finding that it is not a lesser included offense, we observed that subsections (a)(1) and (a)(3) of the home invasion statute (720 ILCS 5/19-6(a)(1), (3) (West 2010)), and their respective allegations, are mutually exclusive:

> "[T]he home invasion statute distinguishes between the commission of the offense 'with a firearm' from the commission of the offense 'with a dangerous weapon, other than a firearm,' by ascribing those two factors to different subsections of the statute. *** [T]he allegation that defendant was armed with a dangerous weapon *other* than a firearm cannot be reasonably inferred from the allegation that defendant was armed with a firearm, because the latter necessarily excludes the

former." (Emphasis in original.) *Booker*, 2015 IL App (1st) 131872, ¶ 59.

¶ 35    In *People v. Clark*, 2016 IL 118845, ¶ 1, the defendant was charged with aggravated vehicular hijacking while armed with a firearm and armed robbery while armed with a firearm. Following a bench trial, the trial court determined that, although the defendant committed the charged conduct, including possessing a firearm, he only used the firearm as a bludgeon. *Id.* Therefore, the court found the defendant guilty of aggravated vehicular hijacking and armed robbery while armed with a dangerous weapon other than a firearm, offenses with which the defendant had not been charged. *Id.* On appeal, we found the uncharged offenses were not lesser-included offenses of the firearm offenses. *Id.*

¶ 36    The State appealed to our supreme court, which agreed that the uncharged offenses were not lesser-included offenses of the charged offenses. *Id.* The court found that the charging instrument lacked any language from which to reasonably infer an allegation that defendant was armed with a dangerous weapon other than a firearm and the charging instrument could not "be construed so 'broadly' as to include the possession of a weapon that is something 'other than a firearm.' " *Id.* ¶ 38. In reaching its decision, the *Clark* court reviewed the decisions in *People v. McBride*, 2012 IL App (1st) 100375, ¶¶ 24, 26 (finding that a firearm did not constitute a "dangerous weapon, other than a firearm," as defined in the aggravated vehicular hijacking statute (internal quotation marks omitted)), and *People v. Barnett*, 2011 IL App (3d) 090721, ¶ 38 (concluding that the uncharged offense of armed robbery while armed with a dangerous weapon other than a firearm was not a lesser-included offense of armed robbery while armed with a firearm) and ultimately found that the two offenses were "mutually exclusive" of each other, and the uncharged offenses (aggravated vehicular hijacking while armed with a dangerous

weapon and armed robbery while armed with a dangerous weapon other than a firearm) were not lesser-included offenses of the charged offenses (aggravated vehicular hijacking with a firearm and armed robbery with a firearm). (Internal quotation marks omitted.) *Clark*, 2016 IL 118845, ¶ 38. As such, the court affirmed the appellate court's judgment of reducing the degree of defendant's convictions to a lesser-included offense of the crime charged. *Id.* ¶¶ 47-49.

¶ 37    Haley argues that *People v. McGuire*, 2023 IL App (3d) 220336-U, provides compelling persuasive authority to reverse his conviction, as it is virtually indistinguishable both factually and procedurally from his case. In *McGuire*, the victim's doorbell rang and, when she answered the door, the door flew open and a large man with a gun in his hand entered her home and put a gun to her head. *Id.* ¶ 4. After a struggle, the victim was able to flee out the back door. *Id.* Her neighbors heard her screams and the police arrived shortly thereafter. *Id.* The State charged the defendant with one count of home invasion with a bludgeon, two counts of home invasion with a firearm, one count of unlawful use of a weapon by a felon, and one count of criminal trespass to residence. *Id.* ¶ 2. Following a bench trial, the defendant was found guilty of only home invasion with a bludgeon and criminal trespass to residence. *Id.*

¶ 38    On appeal, the defendant argued *inter alia* that the evidence did not prove beyond a reasonable doubt that he was guilty of home invasion with a weapon other than a firearm. *Id.* He also argued that the general deferential standard of review did not apply and argued that *de novo* was the appropriate standard of review because we were called upon to determine whether a particular item fell within the definition of a statutory term and whether the uncontested facts were sufficient to prove the elements of an offense. *Id.* ¶ 21. We agreed that the appropriate standard of review was *de novo*, as we were required to determine whether a particular item

14

came within the definition of a statutory term and because the defendant was disputing whether the uncontested facts were sufficient to prove the elements of the offense. *Id.*

¶ 39    McGuire argued that because there was no evidence that the offender was armed with anything other than a firearm, and no evidence was introduced of any item that could be described as a bludgeon, his conviction for home invasion with a bludgeon should be reversed. *Id.* ¶ 22. We found the issue on appeal to be whether the "defendant can be convicted of home invasion with a weapon other than a firearm (a bludgeon) when there was only evidence of the attacker being armed with a firearm, and defendant was acquitted of all firearm charges." *Id.* ¶ 25. We acknowledged that the home invasion statute creates two mutually exclusive categories of weapons: (1) firearm and (2) dangerous weapon other than a firearm. However, we recognized that "there are instances when a gun may be used as a bludgeon." *Id.* ¶ 26 (citing *Clark*, 2016 IL 118845, ¶ 43). We found that there was no evidence—such as testimony about the weight or composition of the firearm that the defendant possessed or about defendant brandishing the firearm as a bludgeon—to support the conclusion that the defendant used the firearm as a bludgeon. *Id.* Accordingly, we found that the defendant was not proven guilty beyond a reasonable doubt of home invasion with a dangerous weapon other than a firearm and reversed his conviction.

¶ 40    Although *McGuire* is somewhat factually dissimilar, we find it dispositive, nonetheless. Here, there was evidence that showed Haley crossing the street and walking towards Lakes' residence with a hammer and crowbar. Lakes testified that Haley kicked the door open. Gabrielle testified that as she was walking down the stairs, the front door "busted" open and Haley came in with a gun "pointed." She testified that she ran down the stairs and Haley followed her. He held a

black gun with both hands; pointed it at Gabrielle, her grandmother, uncles, and cousin Xzaariah; and threatened to kill them. Haley said that he would "blow [their] heads off." Lakes testified that Haley threatened to shoot and kill Lakes and her family and had both hands on the gun and was pointing it from Lakes to each of her sons. Xzaariah testified that she saw Haley standing in the basement with a black gun in his hand, waving it at her grandma, uncles, and cousin Gabrielle. She said Haley threatened to kill them.

¶ 41    Here, the criminal objective in the home invasion was to threaten the imminent use of force upon Lakes and her family. Haley did so with the firearm. While we acknowledge that there are instances when a firearm can be used as a bludgeon to threaten the use of force, there was simply no evidence in this case to suggest that Haley threatened to use or did use the firearm as a bludgeon. There was no testimony regarding the size or the weight of the firearm Haley possessed inside Lakes's residence, nor was there any testimony that Haley wielded the firearm in any manner to suggest that he was using it as a bludgeon. Instead, the evidence established that Haley entered the home with the gun pointed and threatened to "blow [their] heads off." See *McBride*, 2012 IL App (1st) 100375, ¶ 54 ("[O]ur supreme court has made clear that the State has the burden to prove that the gun was a dangerous weapon by presenting evidence that the gun was loaded and operable, or by presenting evidence that it was used or capable of being used as a club or a bludgeon." (Internal quotation marks omitted.)); *People v. Rule*, 2017 IL App (1st) 143534-U, ¶ 38 (victims' testimony that defendant pointed a gun at them and the gun felt heavy and like cold metal when pushed into their skin was sufficient to find that the gun used in the robbery could have been used as a bludgeon).

¶ 42    The jury expressly rejected the theory that Haley committed home invasion while armed

16

with a firearm. The jury's acquittal on the firearm count forecloses reliance on the firearm to satisfy subsection (a)(1) of the home invasion statute. The State cannot circumvent that verdict by recharacterizing the same firearm conduct as possession of a dangerous weapon other than a firearm, where there was no evidence to support it.

¶ 43    Having established that the firearm in Haley's possession was not a bludgeon in this case, we turn to the State's argument that the hammer and crowbar could be considered bludgeons under subsection (a)(1) of the home invasion statute. The State argues that even if Haley did not take either the hammer or crowbar into the residence, his forced entry alone can satisfy the requisite threat of the imminent use of force for purposes of the home invasion statute. The State argues that *People v. Kovacs*, 135 Ill. App. 3d 448 (1985), supports its position on this issue.

¶ 44    In *Kovacs*, the evidence showed that the defendant was armed with a knife and forcibly cut through a screen and broke a glass window. *Id.* at 449. While doing so, and before actual entry, the defendant pointed the knife at the victim and then entered through the broken window still holding the knife in her hand. The victim ran from the house. *Id.* The defendant argued that the unlawful entry of a dwelling place must have occurred first and then there must be a threat of force against a person while within the dwelling place in order to meet the requirements of the statute. *Id.* at 450. The defendant further argued that the evidence merely showed that she had possession of the knife within the home but did not use force or threat of force while in the home because the victim fled. *Id.*

¶ 45    In rejecting the defendant's argument, this court stated that the offense of home invasion could be comprised of a defendant's conduct both within and outside the dwelling and did not require the "fine distinction" urged by the defendant. *Id.* at 451. We found,

17

"no support in the statute for defendant's argument the threat of force against persons within a dwelling may only occur after the unlawful entry. We think the statute was intended to reach the home invader who, while standing on the porch, may threaten verbally and with a gun a resident who responds to a knock on the door and thus gain entry to the dwelling. Further explicit verbal threats while inside the dwelling, still holding the gun, may be unnecessary for the invader to accomplish his purposes and are not necessary to meet the requirements of the home invasion statute. In that illustrative case, the invader entered the dwelling of another without authority knowing it is occupied by a person and, while armed with a dangerous weapon, threatened the use of force; the elements of the statute are met in such circumstances." *Id.*

While we agree with the State that *Kovacs* stands for the proposition that the threat of the imminent use of force directed at the occupant of a dwelling need not occur only after entry into the dwelling, we find that proposition not applicable here. Kovacs was charged with, and convicted of, home invasion while armed with a dangerous weapon, *i.e.*, a knife. The evidence established that the defendant displayed the knife, threatening the person inside the dwelling before she made her unauthorized entry, and then entered the home in possession of a knife. *Id.* at 449-50. That is not the case here.

¶ 46    Here, unlike *Kovacs*, there is no evidence that Haley made threats to those inside Lakes's residence before making his unauthorized entry, nor is there any evidence to suggest that the residents knew Haley was at their door before he appeared inside the residence holding a firearm. Moreover, there is no direct evidence that Haley actually used the hammer or crowbar to enter

Lakes's residence and no evidence whatsoever that he was in possession or remained in possession of either when he entered the residence and confronted the occupants or threatened force within the residence with the firearm. Even assuming that Haley used the hammer and crowbar to gain entry into Lakes's residence, the question is whether that is sufficient to satisfy the statutory requirement that he use or threaten imminent force "while armed with a dangerous weapon other than a firearm." We answer this question by looking to the plain meaning of section 19-6(a)(1).

¶ 47    The interpretation of a statute is a question of law subject to *de novo* review. *Ryan v. Board of Trustees of the General Assembly Retirement System*, 236 Ill. 2d 315, 319 (2010). The primary goal in interpreting a statute is to ascertain and give effect to the legislature's intent. *Id.* The best indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *In re D.F.*, 208 Ill. 2d 223, 229 (2003). If statutory language is ambiguous, we may look to other sources in determining legislative intent. *People v. Rissley*, 206 Ill. 2d 403, 414 (2003). However, "[w]here the statutory language is clear and unambiguous, we will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express." *Ryan*, 236 Ill. 2d at 319.

¶ 48    The purpose of the home invasion statute is to protect persons in their homes. *People v. Kolls*, 179 Ill. App. 3d 652, 655 (1989). Subsection (a)(1) of the home invasion statute provides,

"(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and

remains in the dwelling place until he or she knows or has reason to know that one or more persons is present or who falsely represents himself or herself, including but not limited to, falsely representing himself or herself to be a representative of any unit of government or a construction, telecommunications, or utility company, for the purpose of gaining entry to the dwelling place of another when he or she knows or has reason to know that one or more persons are present *and*

> (1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs[.]"
>
> (Emphasis added). 720 ILCS 5/19-6(a)(1) (West 2022).

¶ 49    "The word 'and' has been defined in our courts as meaning 'in addition to.' [Citation.] It is something in addition to or beyond that which has gone before." *People ex rel. Dixon v. Community Unit School District No. 3*, 2 Ill. 2d 454, 460 (1954). It is well settled that, generally, the use of a conjunctive such as "and" indicates that the legislature intended that all of the listed requirements be met. *In re M.M.*, 2016 IL 119932, ¶ 21; *DG Enterprises, LLC-Will Tax, LLC v. Cornelius*, 2015 IL 118975, ¶ 31; *Jarvis v. South Oak Dodge, Inc.*, 201 Ill. 2d 81, 87 (2002).

¶ 50    Based on our reading of subsection (a)(1) of the home invasion statute (720 ILCS 5/19-6(a)(1) (West 2022)), we find that it requires two separate acts. The use of the word "and" in subsection (a)(1) requires a reading that, in addition to unauthorized entry, the offender "[w]hile armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within [the] dwelling place." (Internal quotation marks omitted.) *Kolls*, 179 Ill. App. 3d at 655; see also *Kovacs*, 135 Ill. App. 3d at 451. Indeed, "home invasion is not complete

until, after an unlawful entry, defendant either uses force or threatens use of force upon a person in the home while armed with a dangerous weapon, or intentionally causes any injury to a person in the home." *People v. Snow*, 124 Ill. App. 3d 955, 963 (1984) (citing Ill. Rev. Stat. 1981, ch. 38, ¶ 12-11(a)).

¶ 51    Based on the evidence in the record, there was no use of force or threat of the imminent use of force until Haley was inside the residence. And, at that time, he had a firearm. The State acknowledges the fact that Haley did not bring the hammer or crowbar into Lakes's residence but argues that this fact is irrelevant to our analysis, as section 19-6(a)(1) does not require that he threaten those inside with them. While it is true that Haley need not have used the bludgeon as an instrument of force or to threaten the imminent use of force, the law still required that he be armed with those items while doing so. Section 19-6(a)(1) plainly requires that to be found guilty under that section, Haley must have been armed with a bludgeon, not a firearm, while using force or threatening the imminent use of force. We have already established that the firearm in this case was not a bludgeon.

¶ 52    Even if a jury could find that Haley used the hammer and/or crowbar to gain entry into the residence, there is simply no evidence that he used force or threatened the imminent use of force while armed with either of those items. Viewing the evidence in the light most favorable to the State, a rational jury could not conclude that the evidence showed beyond a reasonable doubt that defendant committed home invasion with a dangerous weapon other than a firearm. See 720 ILCS 5/19-6(a)(1) (West 2022).

¶ 53    As we are reversing Haley's conviction, we need not address Haley's ineffective assistance claim.

¶ 54                                    III. CONCLUSION

¶ 55        Based on the foregoing, we reverse the judgment of the circuit court.

¶ 56        Reversed.

---

*People v. Haley*, 2026 IL App (1st) 242289

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2023-CR-6006401; the Hon. Ursula Walowski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Omer Jaleel, of Rolling Meadows, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Su Wang, and Shannon Berkey, Assistant State's Attorneys, of counsel), for the People. |